# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN GIBBS,

      Plaintiff,                             Case No.

v.                                      Hon.

OTTAWA COUNTY BOARD OF
COMMISSIONERS, and JOE MOSS,
individually,

      Defendants.

---

Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff John Gibbs, by and through his attorneys, HURWITZ LAW PLLC, brings this action against Defendants Ottawa County Board of Commissioners (the "Board") and Chairman of the Board Joe Moss ("Defendant Moss"), and states the following:

## INTRODUCTION

1. Plaintiff John Gibbs ("Plaintiff") brings this action against the Ottawa County Board of Commissioners (the "Board") and Chairman of the Board Joe Moss

("Defendant Moss") for violations of (a) 42 U.S.C. § 1983 (First Amendment Retaliation); (b) Michigan's Whistleblower Protection Act ("WPA"), MCL § 15.362, *et seq.*; (c) Plaintiff's January 3, 2023 Employment Agreement; and (d) Michigan's statutory defamation law, MCL § 600.2911, *et seq.* Plaintiff served as Ottawa County Administrator until being terminated "with cause" on February 29, 2024, after raising a series of concerns that were of grave public importance regarding cronyism and malfeasance by the Board. To justify Plaintiff's "for cause" termination, Defendant Moss abandoned rational governance and maliciously published on his own Facebook page a litany of provably false statements about Plaintiff that lack factual support.

## PARTIES AND JURISDICTION

2.      Plaintiff is a resident of Byron Center, Kent County, Michigan.

3.      Defendant Ottawa County Board of Commissioners is a governmental body established by the Michigan Legislature and is in Ottawa County.

4.      Defendant Joe Moss is the Chairman of the Ottawa County Board of Commissioners.

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claim.

2

7.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Defendant's place of business is located and where the events giving rise to Plaintiff's claims took place.

8.     At all times material to this Complaint, Defendant acted under color of law, meaning under color of the statutes, codes, ordinances, regulations, policies, customs and usages of the State of Michigan and/or the County of Ottawa, Michigan.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment with the Board

9.     On January 3, 2023, Plaintiff and the Board entered into a contract entitled "Employment Agreement for Ottawa County, Michigan Administrator." (the "Employment Agreement"), attached as **Exhibit 1**.

10.     Pursuant to the express terms of the Employment Agreement, the Board hired Plaintiff as Ottawa County Administrator for a period of three years, from January 3, 2023 until January 2, 2026.

11.      The Employment Agreement provides that the Board would pay Plaintiff $210,000.00 per year, together with an annual bonus.

12.     Exhibit B to the Employment Agreement provides that Plaintiff was to receive from the County as fringe benefits five weeks of vacation each year, and a motor vehicle allowance of $833.33 per month.

13.     Plaintiff's termination is governed by Section 9 of the Employment

Agreement.  Section 9 states:

> Notwithstanding any other term contained herein,
> this Agreement may be terminated without cause
> upon ninety (90) days written notice, given by either
> party hereto, and may be terminated at any time by
> Ottawa County for cause, (defined as intentional
> fraud, dishonesty, gross misconduct, or willful
> malfeasance in connection with the performance of
> John Gibbs's duties under this Agreement).

14.     In the event of the termination of the Employment Agreement, Section

9(a) provides:

> If the Board of Commissioners terminates John
> Gibbs's employment during the term of this
> Agreement, John Gibbs shall receive a lump sum
> severance payment in the amount of nine (9) months
> of his then annual salary, plus paid health insurance
> for nine (9) months, provided the termination is not
> for cause.

15.     Section 9(a) provides that the Board is required to give Plaintiff "90

days written notice" and then pay to Plaintiff nine months' salary, plus paid health

insurance, in the event of his termination without cause (the "Severance Payment").

16.     In the event of the termination of the Employment Agreement for cause,

Section 9(c) provides:

> If this Agreement is terminated by the Ottawa
> County Board of Commissioners for cause in
> connection with the performance of his duties under
> this Agreement, John Gibbs shall not receive any

4

salary paid as severance following the effective date
of his termination.

17.    Plaintiff diligently and satisfactorily performed the job duties assigned

to him pursuant to the Employment Agreement.

18.    At no point during his employment with the Board was Plaintiff subject

to any disciplinary action or complaints that he was made aware of.

19.    Throughout his employment, Plaintiff excelled in his role, and

accomplished, *inter alia*:

  a.    Dramatically improved the transparency of the
        budgeting process by adding additional public
        budget deliberation meetings;

  b.    Procured long-needed budgeting software to make
        it easier for staff, commissioners, and the public to
        view the budget;

  c.    Laid the groundwork for a new, data-driven County
        Strategic Plan based on metrics;

  d.    Added accountability and transparency to the
        process of reviewing and approving grants;

  e.    Increased financial transparency by making the
        complete accounts payable report public;

  f.    Restructured the Capital Improvement Planning
        process and restructured the Facilities Department
        to better facilitate maintenance and usage of the
        County's physical assets;

  g.    Initiated a review of the Southwest Ottawa County
        landfill to find solutions to the County's $500,000
        annual expenditure;

h.   Streamlined the Communications process and added accountability to County messaging by creating a Communications Department with a Director;

i.   Staffed the County's new Department of Veterans Affairs with a seasoned U.S. Army veteran who has in his short tenure already improved County efforts for our veterans;

j.   Upgraded the Executive Assistant position to Senior Executive Aide to the Administrator, giving future Administrators high-level policy support and enabling the Administrator to focus more on big picture items and less on daily minutiae.

**Plaintiff's Complaints Regarding the Corporation Counsel**

20.   The Board engages Kallman Legal Group, PLLC, a law firm headquartered in Lansing, Michigan, and operated by attorney David Kallman, as its Corporation Counsel.

21.   On or about March 10, 2023, Plaintiff sent an email to Mr. Kallman, two attorneys employed by the Corporation Counsel (Jack Jordan and Lanae Monera), Defendant Moss, and Vice Chair Sylvia Rhodea (the "March 10 Email").

22.   In the March 10 Email, Plaintiff explained three specific concerns about the Corporation Counsel's performance, namely (1) the insufficient availability of legal counsel with the effect that Plaintiff was often left without legal advice; (2) the complete lack of any system with which to track legal deliverables, with the effect that requests for legal service were left outstanding for long periods of time; and (3) the competency of the Corporation Counsel to give appropriate legal advice.

6

Case 1:24-cv-00357 ECF No. 1, PageID.7 Filed 04/08/24 Page 7 of 41

23.    Plaintiff's March 10 Email provided actionable and reasonable solutions to each problem asserted.

24.    Specifically, Plaintiff wrote as to the insufficient availability of legal counsel:

> Issue: On Wednesdays and Fridays, I'm largely without legal answers. I need at least one legal person available by phone or in the office every day of the week, as soon as is feasible.
>
> Proposed Solution 1: Have someone on call Wednesdays and Fridays.
>
> Proposed Solution 2: Have at least one person physically in the office M-F.

25.    Plaintiff wrote as to the Corporation Counsel's deliverables tracking.:

> Issue: There is no system for tracking deliverable, and as such, there is mostly never any follow up on items requested.
>
> Proposed solution: Start with the below, which I'll put into a shared spreadsheet, and we can expand upon it next week

26.    Beneath this statement, Plaintiff provided a table of tasks for the Corporation Counsel and due dates for the completion of those tasks.

27.    Plaintiff wrote as to the quality of the Corporation Counsel's advice:

> Issue: When I have a legal question, the answer can never be "I don't know". If none of us knows the answer, I need to be given a path by which I can get an answer in a timely manner, even if I need to ask an outside source.

7

> Proposed solution: Ask Dave [Kallman] for advice/recommendations if neither counsel or myself know the answer.

28.    Plaintiff's speech in the March 10 Email addresses the ability and capacity of the County's Corporate Counsel to provide appropriate and timely legal advice to the County, and the execution of its public duties.

29.    None of the concerns Plaintiff raised in the March 10 Email were addressed by either the County or the Corporation Counsel.

30.    Plaintiff continued to work diligently and competently in his role.

31.    During this period, Plaintiff received no complaints about his performance from the Board, Defendant Moss, or any other person.

32.    On July 18, 2023, Plaintiff sent a letter to Defendant Moss and Ms. Rhodea, in which Plaintiff detailed the extensive deficiencies in the Corporation Counsel's performance (the "Deficiency Letter").

33.    The Deficiency Letter provides in part:

> I do not have confidence in the ability of the Office of Corporation Counsel to fulfil its duties to the County.
>
> *     *     *
>
> It is with that experience that I inform you of my judgment that the Office of Corporation Counsel in its current state is not able to effectively perform the above functions, and is thus ill-positioned to serve you or the County.
>
> **The Problems** (emphasis in original)

• A County Commissioner was given totally incorrect advice by Counsel, causing an issue that should have been handled internally by the Board of Commissioners to be sent to outside Counsel, at cost to the County, and at the potential for litigation that could have been avoided if the issue had been handled internally. Importantly, Counsel did not consult with the Board Chair and Vice Chair – or any other member of the Board for that matter – nor with the County Administrator, prior to making this erroneous decision. The continued risk that this method of operation poses to the County cannot be emphasized too strongly.

• A sensitive Freedom of Information Act (FOIA) request implicating the privacy of dozens of candidates who applied for a position directly reporting to the County Administrator, was processed without consultation with the County Administrator, the Chair of the Board, or any member of the Board of Commissioners. Decisions of such consequence must be shared with leadership beforehand, as such a decision could have a chilling effect on applicants to County positions, who now face the potential to be targeted and attacked as the result of their information being released in an inappropriate manner.

• Significant delays in providing responses to routine requests for a legal opinion, often taking several weeks or months for standard requests, if any response is received at all. This applies not only to requests from the Office of the County Administrator, but also to requests from numerous County stakeholders, who have informed me in confidence of their concerns, including weeks- or months-long delays and a lack of responsiveness to legal requests.

• A general lack of organization, including the stark absence of any system to organize, categorize, and

track workload and tasks. This results in requests going unanswered or taking many weeks or months to address. To address this substantial problem, the County Administrator directed Counsel to adopt a workflow system to organize their work. However, they refused to do so, and would not meet with the Deputy County Administrator and Director of IT, who were ready and prepared to help them develop such a system at no cost to the County. Rather, Counsel insisted that they perceived no issues on their end and ignored the County Administrator's request to address the issue.

• In nearly all counties, Corporation Counsel reports to the County Administrator. This is the industry standard best practice and is also the reporting structure in the most current organizational chart for Ottawa County. Nonetheless, Counsel disregards this standard arrangement, and believes that it reports only to the Board of Commissioners, and not to the County Administrator. This results in Counsel routinely disregarding directives and deadlines from the County Administrator, and failing to inform the Administrator on significant issues, due to a belief that they are not accountable to the County Administrator. This leaves the administrator unable to correct problems in the conduct of Counsel, or direct their activities. The County Administrator, who is in the office daily and thus best positioned to supervise the day-to-day activities of Counsel, must have disciplinary oversight over that office, as is the standard in nearly all Counties.

• Counsel works only three days per week, which is not enough to manage its workload. When the County Administrator brought this to the attention of Counsel, they indicated that they did not perceive this to be a problem and refused to consider

suggestions from the County Administrator for increasing their work capacity.

• Counsel is unable or unwilling to write professional legal memos to deliver opinions and analyses. The use of legal memos to convey a response to a legal inquiry is the standard practice [in] public policy. This is because a legal memo allows legal counsel to deliver analyses clearly and concisely, to reference the relevant statutes, case law, and comparable situations in the footnotes or inline comments, and to redline changes to proposed policy documents so that edits can clearly be seen and resolved. Instead, Counsel only gives opinions orally, or in very short, informal written responses, with no supporting statutory or case law references. This approach of providing only incomplete, informal responses makes it difficult to create policy.

• Counsel lacks experience in municipal law and in the practice of providing legal counsel to government policymakers. This results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information. It also results in erroneous legal opinions. As an example, the one and only time that the County Administrator received a legal memo from Counsel when one was requested, it contained an erroneous legal analysis pertaining to a major item before the Board of Commissioners, causing significant embarrassment.

• Corporation Counsel often responds to a request for an opinion or analysis with "I don't know." It is far outside of professional standards for Counsel to respond with "I don't know", when asked for a legal opinion or analysis by County leadership or County stakeholders. Rather, the industry standard practice is for a firm providing Counsel services to leverage

11

the resources of their firm, and if necessary, the extended networks connected to it, to do what it takes to get an answer in a timely manner.

• Significant spelling, formatting, and grammatical errors occur in official documents, requiring the County administrator to review and edit the documents prior to approval. Counsel refuses to use Track Changes, the industry standard practice for communicating changes to documents, to indicate and redline changes made to a document.

In an effort to address these issues, I have brought the above problems to the attention of Counsel on numerous occasions, both in writing an in person, even all the way up to the top leadership of the firm which provides the County's Corporation Counsel services. But each time, these concerns were quickly rejected, and no corrective action was taken. With Counsel unresponsive to my attempts at corrective oversight and unwilling to acknowledge any problems or improve their performance, I am now left with no other recourse but to ask you, the Board of Commissioners, to take action, to prevent any further risk to the County.

### **The Solution** (emphasis in original)

In contrast to the significant problems in the areas outlined above, it is my judgement that the firm providing Corporation Counsel services is properly and correctly handling matters of litigation involving the County Board of Commissioners. Therefore, I propose that the firm currently providing Corporation Counsel services now handle only litigation services, and will no longer handle, nor be paid for, any non-litigation services.

Additionally, in order to conform to the standard used by nearly all counties, and to conform to the existing organizational chart for Ottawa County, I

request that the firm currently providing Corporation Counsel services now report directly to the County Administrator.

*     *     *

I would be happy to lead the search for new Corporation Counsel, who would replace the non-litigation responsibilities which the firm currently providing Corporation Counsel services would be required to relinquish. Any new Corporation Counsel must be deeply steeped in municipal law as well as experienced in providing legal counsel to government policymakers.

It is important to note that my analysis does not reflect upon the individual character of the persons or firm that currently comprise the Office of Corporation Counsel. Nor does it reflect upon any problem with any said individuals on a personal level. Rather, this analysis is strictly professional in nature, focusing narrowly on the functioning of the Office of Corporation Counsel. It is not meant to denigrate any person, persons, or firm.

I hope to meet with you on Tuesday, July 25th, prior to the Board of Commissioners meeting at 4 PM, to discuss an action plan based on the above.

Thank you for your consideration of this critical problem. I look forward to discussing this issue soon."

34.     The Deficiency Letter addressed shortcomings in the Corporation Counsel's exercise of its public functions.  Each of Plaintiff's complaints within the Deficiency Letter constitutes a legitimate public concern with the operation of the Corporation Counsel in its service to the County.

13

35.   Ergo, the Deficiency Letter is directed narrowly to complaints about the Corporation Counsel's competency to perform public governmental functions.

36.   This is clear from Plaintiff's statements in the Deficiency Letter that "the Office of Corporation Counsel in its current state is not able to effectively perform [its public functions] and is thus ill-positioned to serve [Defendant Moss and Ms. Rhodea] or the County."

37.   Furthermore, Plaintiff's states in the Deficiency Letter that Corporation Counsel is

> . . . properly and correctly handling matters of litigation" and that "[i]t is important to note that [Mr. Gibbs'] analysis does not reflect upon the individual character of the persons or firm that currently comprise the Office of Corporation Counsel. Nor does it reflect upon any problem with any said individuals on a personal level. Rather, this analysis is strictly professional in nature, focusing narrowly on the functioning of the Office of Corporation Counsel.

38.   These statements demonstrate that Plaintiff's speech in the Deficiency Letter is narrowly directed on the Corporation Counsel's performance of its public government functions and does not address any private concerns of Plaintiff whatsoever.

39.   Plaintiff's insistence that the Corporation Counsel be retained for litigation matters demonstrates that his speech did not address any personal concern or animosity he felt towards the Corporation Counsel.

**Defendants Retaliated Against Plaintiff**

40.    On July 21, 2023, Plaintiff met with Defendant Moss, Ms. Rhodea, Commissioners Roger Belknap, Allison Miedema, Gretchen Cosby, Mr. Kallman, Mr. Jordan, and Steven Kallman (another attorney employed by the Kallman Legal Group, PLLC).

41.    The purpose of the meeting was to discuss the Deficiency Letter. However, Plaintiff's concerns regarding the Corporation Counsel's performance were not addressed during the meeting, and instead David Kallman insulted Plaintiff and accusatorily stated that the true purpose of the Deficiency Letter was for Plaintiff to seize power within the County.

42.    During the meeting, the Board stated that Plaintiff was "possessed by the devil."

43.    The Board did not investigate Plaintiff's whistleblower concerns.

44.    On October 24, 2023, a lawsuit was filed against the Board and Plaintiff alleging, *inter alia*, that Plaintiff had unlawfully discriminated against an applicant for employment with the County (the "*Kimball*" matter).

45.    On October 25, 2023, Plaintiff was instructed by Defendant Moss that Plaintiff should stop communicating with members of the Board, restricting Plaintiff's ability to perform his duties.

46.     On November 6, 2023, the Board held a closed meeting to discuss Ottawa County Health Officer Adeline Hambley's severance payment.

47.     During this meeting, the Board agreed to pay Ms. Hambley $4.0M in exchange for Ms. Hambley's resignation.

48.     Plaintiff protested the decision as a gross misuse of taxpayer funds.

49.     On January 9, 2024, Plaintiff met with Defendant Moss and Ms. Rhodea, at which time Defendant Moss and Ms. Rhodea asked Plaintiff to resign from his position, stating that his resignation would secure a settlement in the *Kimball* lawsuit.

50.     Upon information and belief, Plaintiff's resignation has never been a negotiable settlement term in the *Kimball* lawsuit.

51.     Plaintiff refused to resign during the January 9, 2024 meeting.

52.     Although Defendants asked Plaintiff to resign, at no point during the January 9, 2024, meeting did Defendants criticize Plaintiff's performance.

53.     On January 12, 2024, Defendant Moss telephoned Plaintiff and again requested that he resign, but did not criticize Plaintiff's performance.

54.     Upon information and belief, Defendant Moss is a business partner with members of the Kallman Legal Group, and Ms. Rhodea has personal connections with the firm.

55.     Defendants are motivated by personal interests to retain the Kallman Legal Group as the County's Corporation Counsel and retaliated against Plaintiff for criticizing the firm.

56.     On January 15, 2024, Plaintiff attended an Insurance Authority meeting with Defendant Moss, Ms. Rhodea, and Ms. Cosby.

57.     During this meeting, Plaintiff protested the Board's decision to pay Ms. Hambley a $4.0M settlement for her resignation.  Plaintiff did so in a professional manner and did not raise his voice.

58.     That same day, Plaintiff's counsel sent the Board a letter explaining that the Board had no cause to terminate Plaintiff or to request his resignation.

59.     On February 15, 2024, Plaintiff's counsel sent a letter to the Board again stating that the Board had no cause to terminate Plaintiff or request his resignation.

60.     On February 22, 2024, the Board held a closed meeting with Plaintiff, during which the Board informed Plaintiff of "complaints" concerning his performance, none of which had been raised prior to the February 22, 2024 meeting.

61.     None of the complaints raised at the February 22, 2024 meeting had been previously reported to the County's Human Resources Department, and at no point prior to the meeting was Plaintiff told the complaints.

62.   During the February 22, 2024 meeting, the Board voted to place Plaintiff on administrative leave.

**Defendant Moss Defamed Plaintiff**

63.   On February 23, 2024, Defendant Moss sent a letter to Plaintiff detailing the complaints regarding his performance (the "Complaint Letter").

64.   The Complaint Letter states the following:

   a.   A commissioner has reported that he believes [Plaintiff] was not truthful in his testimony in the Hambley hearing. [Plaintiff] repeatedly stated he did not remember information when questioned.

   b.   I witnessed [Plaintiff] threaten to physically harm Attorney Jack Jordan to [Defendant Moss] immediately after an Ottawa County Insurance Authority Meeting.

   c.   I witnessed [Plaintiff] make extremely disparaging comments about the female Commissioners, most notably sexual/defamatory comments about Commissioner Gretchen Cosby on multiple occasions.

   d.   [Plaintiff] had me assist him in bugging his office with a hidden camera fixed on his meeting table to record conversations with Commissioners and County Employees.

   e.   [Plaintiff] routinely made derogatory comments about the majority of County Commissioners and Corporation Counsel, claiming their Protestant faith severely impacted their IQ and work ethic.

   f.   [Plaintiff] routinely subjected me to what I would consider a degrading and hostile work environment. He would routinely hand out meaningless tasks, many of which had little to do with county operations day, night, weekends, and holidays. This around the clock work style and

18

abusive environment was detrimental to my mental health and personal life.

g.  At a meeting on February 12, 2024[,] entitled "Performance Improvement Conversation", [Plaintiff] insinuated that I needed to be loyal to him and not the Board of Commissioners. [Plaintiff] made a comment during the meeting which he insinuated terminating my employment if I didn't fight for him.

65.  The Complaint Letter attributes the following defamatory statements to an anonymous "different county employee":

a.  [Plaintiff] has refused to solicit necessary information from other departments, such as potential ongoing financial fraud. [Plaintiff] has refused to make a plan for handling critical union negotiations and insists on doing it himself, even though he is not skilled in this area… [Plaintiff] refuses to provide oversight and direction to these department heads.

b.  [Plaintiff] has expressed on multiple occasions that he wants to "beat Jack Jordan to death" for perceived slights and offenses.

c.  [Plaintiff] maintains a very confrontational and adversarial relationship with all of the Commissioners except [Defendant Moss]. He expresses that he does not need or value their input.

d.  [Plaintiff] tasked the Deputy Administrator and Senior Executive Aide with obtaining security services for a 'bug sweep' and review of his materials. [Plaintiff] wanted this done monthly. The resulting paranoia, anxiety, and fear created a hostile workplace because there was a perception that bugs and listening devices were installed in the offices.

e.  [Plaintiff] was having zero contact or communication with the legal team on policy proposals, and they were

consequently not having any communications with him. This breakdown in communications is causing ongoing problems and failures for important County initiatives.

f.      [Plaintiff] has repeated on several occasions, a bizarre theory about Commissioner Gretchen Cosby being 'out of God's grace' because of a perceived pattern of infidelity, specifically accusing her of cheating on her husband with doctors and patients. He said his perception that there were problems in her marriage, because she wasn't always wearing a wedding ring, was likely due to infidelity on her part…He said it was common knowledge that nurses were unfaithful in their marriages. This seemed to be solely motivated by her reasoned and patient opposition to him. Even though I don't believe Commissioner Cosby is evangelical, he refers to her and other[s] as retard evangelicals.

g.      [Plaintiff] regularly and repeatedly overrules and contradicts decisions made by the Commissioners.

h.      [Plaintiff] was often planning to terminate employees without cause and without documentation. The proper process to document cause, initiate an HR-led hearing and investigation, and then terminate if the issues could not be resolved, was never followed.

66.      The Complaint Letter attributes the following defamatory statement to an anonymous "Ottawa County Board Commissioner":

a.      [Plaintiff] drafted a Security Reimbursement Policy and I was not in support of it and gave him my reasons why I wasn't in support (Commissioner Roger Belknap and Commissioner Gretchen Cosby were with me when I shared with John my reasons). During [Plaintiff]'s initial visit the end of December with newly elected commissioner, Kendra Wenzel, John decided to share with Kendra that I wasn't in support of the resolution and told her that he believed it was because I was a woman (which is completely false and baseless).

67.    The Complaint Letter goes on to make the following defamatory statements:

a.    It was reported that employees talked about physically harming [Defendant Moss] on November 28, 2023 . . . [Defendant Moss] followed up with [Plaintiff] about the complaint multiple times . . . [Plaintiff] did not seem to take this situation seriously. He later told [Defendant Moss] that the person who reported the incident was mentally unstable. The delays in the process and the apathy displayed by the [Plaintiff] caused concern. To [Defendant Moss's] knowledge, no disciplinary or corrective action was taken in this situation . . . The statement made by [Plaintiff] that the person who reported the threats was "mentally unstable" was dishonest.

b.    In the December Insurance Authority meeting, [Defendant Moss] witnessed [Plaintiff] become needlessly aggressive with Attorney Jack Jordan. He raised his voice at him during the meeting in an unprofessional manner over the entire room. It was very strange and Jack responded quietly and professionally. This pattern became apparent in the November/December timeframe. For example, Commissioners Rhodea and Miedema informed [Defendant Moss] they had seen a similar outburst from [Plaintiff] during a Road Commission meeting. They were concerned with [Plaintiff] treating other people in the county in that same manner, with unwarranted aggression. This behavior contributed to board members losing trust in [Plaintiff].

c.    In early December of 2022, the chairs of the board subcommittees increasingly shared concerns about interactions with [Plaintiff], and questioned whether he had begun subverting their efforts regarding forwarding and/or holding back agenda items.

d.    Subcommittee chairs were concerned with [Plaintiff's] desire to increase [Plaintiff's] control within county policies related to personnel issues.

e.    [Two employees] appeared to be outwardly disturbed by sexual statements which had been made about Commissioner Cosby [by Plaintiff], wanting to protect her from being hurt by hearing the statements. It was clear being subjected to listening to [Plaintiff's] sexual statements about Gretchen had put them in a difficult situation.

f.    The two employees also shared [Plaintiff's] ongoing shut-out of communications with corporate counsel and lack of willingness to work with them for the betterment of the county. They additionally shared an outburst following an insurance authority meeting where [Plaintiff] threatened bodily harm to Jack Jordan.

68.    Collectively, the above statements within the Complaint Letter are the "Defamatory Statements."

69.    The Defamatory Statements are false and have no basis in fact.

70.    On February 23, 2024, Defendant Moss published the Complaint Letter to his public Facebook page, attaching to a Facebook post a freely accessible copy of the Complaint Letter (the "Facebook Post").



71.    The Facebook Post published the Complaint Letter and all of the Defamatory Statements therein to the public.

72.    As a result of Defendant Moss's publication of the Complaint Letter, the Complaint Letter and the Defamatory Statements therein were published in several newspapers, including, *inter alia*:

     a.    An article published on February 23, 2024, entitled "Letter alleges Ottawa County Administrator threatened violence, bugged office", published by Fox 17.  This article quotes from and allows access to the Complaint Letter.

     b.    An article published on February 23, 2024, entitled "Threats, incompetence: Allegations fly between Ottawa County and John Gibbs", published by the Holland Sentinal.  This article quotes from the Complaint Letter.

     c.    An article published on February 23, 2024, entitled "Ottawa County Board Chair complaints against John Gibbs", published by WZZM13.  This article quotes from and allows access to the Complaint Letter.

73.    As a result of Defendant Moss' publication of the Complaint Letter, the Defamatory Statements have been widely publicized.

74.    Defendant Moss knew that the Defamatory Statements were false and/or reckless to allege.

75.    This is clear because the complaints and allegations contained within the Defamatory Statements, including allegations that Plaintiff engaged in criminal conduct, allegedly occurred months earlier, but they were not published by Defendants until after Plaintiff engaged in protected whistleblower activity.

76.     If the complaints and allegations contained within the Defamatory Statements were true, or if Defendant Moss reasonably believed them to be true, Defendant Moss or the Board would have raised them with Plaintiff prior to Plaintiff engaging in protected whistleblower activity.

77.     On or about February 27, 2024, Plaintiff responded to the Complaint Letter, addressing each of the Defamatory Statements line-by-line in order to demonstrate to Defendant Moss falsified the Defamatory Statements.

78.     Upon information and belief, Defendant Moss did not share Plaintiff's response to the Defamatory Statements to the Board.

### Plaintiff's Termination

79.     On February 29, 2024, the Board terminated Plaintiff for cause, citing the Defamatory Statements recited in the Complaint Letter.

80.     But for Plaintiff's protected whistleblower activities described above, Plaintiff would not have been terminated.

81.     The Defamatory Statements were also a but for cause of Plaintiff's termination.

82.     Plaintiff's termination violated the Employment Agreement.

83.     Defendants terminated Plaintiff "with cause" but Plaintiff's conduct did not constitute any of the "with cause" termination reasons in the Employment

Agreement, *i.e.*, "intentional fraud, dishonesty, gross misconduct, or willful malfeasance."

84.     Defendant therefore failed to pay Plaintiff his contractual severance pay.

## COUNT I
## 42 USC § 1983
## FIRST AMENDMENT RETALIATION
## (Against The Board)

85.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

86.     The First Amendment of the United States Constitution, as incorporated into the 14th Amendment, prevents governments from abridging an individual's freedom of speech.

87.     The freedom of speech is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415, 99 S. Ct. 693, 697, 58 L. Ed. 2d 619 (1979).

88.     The First Amendment protects an individual from retaliation when he has exercised his freedom of speech.

89.     The rationale for protecting a public employee's right to comment on matters of public concern is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their

public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).

90.    An employee speaking as a citizen is speaking on a matter of public concern when that speech can be fairly considered as relating to any matter of political, social, or other concern to the community.  Another consideration is whether the speech involves a subject of general interest and of value and concern to the public.  *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012).

91.    Speech entails a matter of public concern when the speech involves issues for which information is needed to enable members of society to make informed decisions regarding their government's operation.  *Banks v. Wolfe Co. Bd. of Ed.*, 330 F.3d 888, 892 (6th Cir. 2003).

92.    "Public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  *Id.* at 83-84.

93.    "When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation*." Garvin v. Detroit Bd. of Educ.*, No. 298838, 2013 WL 951118, at *11 (Mich. Ct. App. Feb. 26, 2013), citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

94.    Plaintiff's speech addressing the performance of the Corporation Counsel, through the March 10 Email and the Deficiency Letter, was not made pursuant to his duties as County Administrator.

95.    Where an employee's complaint constitutes an extraordinary, rather than everyday communication, that complaint will fall outside the scope of the employee's duties and therefore within the scope of the First Amendment protections. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 768 (6th Cir. 2010).

96.    Here, the Deficiency Letter is plainly not an everyday communication, but rather constitutes an extraordinary communication necessitated by extraordinary circumstances. Indeed, Plaintiff writes in the Deficiency Letter that ". . . after much deliberation, [he was] duty-bound to inform you of a significant issue which hinders [his] ability to carry out the responsibility you have entrusted to [him]."

97.    The Deficiency Letter was therefore an extraordinary communication necessitated by extraordinary circumstances, vis-à-vis, the Corporation Counsel's continued deficient performance.

98.    Accordingly, the Deficiency Letter falls outside the scope of Plaintiff's employment and his speech pursuant to which was undertaken as a private citizen.

99.    "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).

100.   Plaintiff's speech was made as a citizen on a matter of public concern.

101.   Bringing to light potential or actual wrongdoings or a breach of the public trust are generally matters of public concern.  *Connick v. Myers*, 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L. Ed. 2d 708 (1983).  Moreover, "discipline and morale in the workplace are related to an agency's efficient performance of its duties[.]" *Id*.

102.   The continued deficient performance of the County's Corporation Counsel, and the expenditure of significant public funds, is a matter of public concern.

103.   Defendant punished Plaintiff for raising matters of public concern, including, *inter alia*, placing Plaintiff on administrative leave and terminating him.

104.   Plaintiff's termination was motivated, at least in part, by the exercise of his First Amendment Right to free speech.

105.   Plaintiff's interest as a citizen in speaking on these matters was significant, as they concerned substantial matters of ethics and public safety that she was well informed and entitled to make.

106.   Plaintiff's speech had no impact on the efficiency of the County, and therefore Defendants had no interest in curtailing this speech to promote the efficiency of the public services they performed through their employees.

107.   Defendants acted with deliberate indifference to Plaintiff's presumed and actual innocence.

108.   Defendants agreed to, approved, and ratified this unconstitutional conduct.

109.   It would have been plainly obvious to a reasonable official that such actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

110.   Defendants' actions and inaction, as set forth above, were fundamentally unfair to Plaintiff.

111.   As a direct and proximate results of Defendants' retaliation, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation, and embarrassment and the physical effects associated therewith, and will so suffer in the future.

112.   As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work in the future.

**COUNT II**
**MCL § 15.361,** *et seq.*
**RETALIATION IN VIOLATION OF**
**MICHIGAN'S WHISTLEBLOWER PROTECTION ACT**
**(Against The Board)**

113. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

114. At all relevant times, Defendant was an employer and Plaintiff was an employee covered by and within the meaning of the WPA, MCL § 15.361, *et seq*.

115. Defendant is a public body within the meaning of the WPA, MCL § 15.361, *et seq*.

116. MCL § 15.362 protects an employee who "reports or is about to report, verbally or in writing, a violation or a suspected violation of law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body[.]"

117. Plaintiff engaged in protected activity under MCL § 15.362 when he reported both directly and through counsel to the Board, a public body, various suspected violations of the law, including Corporation Counsel's deficient performance and inflated billing practices.

118. Defendants retaliated against Plaintiff because of his protected activity in violation of the WPA by, *inter alia*, terminating his employment.

119.   As a direct and proximate cause of Defendants' violation of the WPA, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

120.   As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work in the future.

**COUNT III**
**BREACH OF CONTRACT (TERMINATION WITHOUT CAUSE)**
**(Against The Board)**

121.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

122.   To prevail on a claim for breach of contract, a plaintiff must establish by a preponderance of the evidence that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *First Am. Title Ins. Co.*, 488 Mich. at 100.

123.   The goal in interpreting a contract is to give effect to the intent of the parties, and "[t]he words used in the contract are the best evidence of the parties' intent." *Hemlock Semiconductor, LLC*, 313 Mich. App. at 446.

31

124.   The Employment Agreement executed on January 3, 2023, is a valid contract.

125.   The termination of Plaintiff's employment is governed by Section 9 of the Employment Agreement.  Relevantly, Section 9 governs the circumstances under which Plaintiff may be terminated with or without cause, and states:

> Notwithstanding any other term contained herein, this Agreement may be terminated without cause upon ninety (90) days written notice, given by either party hereto, and may be terminated at any time by Ottawa County for cause, (defined as intentional fraud, dishonesty, gross misconduct, or willful malfeasance in connection with the performance of John Gibbs's duties under this Agreement).

126.   In the event of the termination of the Employment Agreement, § 9(a) provides:

> If the Board of Commissioners terminates John Gibbs's employment during the term of this Agreement, John Gibbs shall receive a lump sum severance payment in the amount of nine (9) months of his then annual salary, plus paid health insurance for nine (9) months, provided the termination is not for cause.

127.   In the event of the termination of the Employment Agreement for cause, Section 9(c) provides:

> If this Agreement is terminated by the Ottawa County Board of Commissioners for cause in connection with the performance of his duties under this Agreement, John Gibbs shall not receive any salary paid as severance following the effective date of his termination.

128.   Defendants purported to terminate Plaintiff "for cause", pursuant to Section 9(c) of the Employment Agreement.

129.   Pursuant to Section 9, "for cause" is defined as "intentional fraud, dishonesty, gross misconduct, or willful malfeasance in connection with the performance of John Gibbs's duties under this Agreement"

130.   Defendant's proffered reason for terminating Plaintiff was that he had received complaints against him.

131.   Specifically, the Board referred to the complaints contained within the Defamatory Statements.

132.   Prior to Plaintiff being placed on administrative leave, Plaintiff had never received any complaints or negative feedback in relation to his performance.

133.   The complaints within the Defamatory Statements are substantially false and have no basis in fact.

134.   Accordingly, Plaintiff was not terminated "for cause"

135.   Rather, Plaintiff was terminated "without cause" and Defendants has a contractual obligation to pay to Plaintiff the Severance Payment.

136.   Defendants failed to pay to Plaintiff the Severance Payment.

137.   As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered emotional and physical distress, mental and physical anguish,

loss of reputation, humiliation, embarrassment, and the physical effects associated therewith, and will so suffer in the future.

138.   As a further direct and proximate result of Defendants' breach of contract, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work and will so suffer in the future, and he will suffer additional damages in the future.

**COUNT IV**
**M.C.L. § 600.2911,** *et seq.*
**<u>VIOLATION OF MICHIGAN DEFAMATION LAW</u>**
**<u>(Against All Defendants)</u>**

139.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

140.   To prevail on a claim for defamation, a plaintiff must establish by a preponderance of the evidence: (1) that the defendant made a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Rouch v. Enquirer & News of Battle Creek*  440 Mich. 238, 251 (1992); *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 589 (1984).

141.   Where the plaintiff in a defamation claim is a public figure, they must prove that the statement was false and that it was made with the requisite level of culpability. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).  The requisite level of culpability for a plaintiff who is a public figure must prove is that the false statements were made with "actual malice". *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

142.   "Actual malice" does not require a showing of ill will, but "exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 114 (2010).

143.   This requirement is codified by M.C.L. 600.2911(6), which provides: "An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false."

144.   Whether the statements are defamatory and whether the evidence presented is sufficient to show actual malice on the part of the defendant present questions of law to be decided by the courts. *Smith*, 487 Mich. At 111.

145.   By reason of his public role and political candidacy, Plaintiff in the present case is a public figure.

146.   Plaintiff asserts that the subjects of his claim for defamation are the Defamatory Statements contained within the Complaint Letter.

147.   Each of these statements are false and defamatory because they, individually and when considered together, harm Plaintiff's reputation to the extent that his reputation within the community has been lowered and others may be deterred from associating with him.  *Lawrence v. Burdi*, 314 Mich. App. 2023, 214.

148.   By making the Facebook Post on February 23, 2024, and attaching the Complaint Letter thereto, Defendant Moss published the Defamatory Statements within the Complaint Letter to an indeterminate number of public individuals.

149.   In doing so, Defendant Moss carried out an unprivileged communication with at least tens of thousands of people.

150.   It is true that courts outside of Michigan have held that Internet message boards and similar communications platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact.  *Summit Bank v. Rogers*, 206 Cal. App 4th 669, 696-698 (2012).  However, even if this court were to adopt this presumption, it must be defeated here because Defendant Moss implied the truth of the statements within the Complaint Letter by stating in the Facebook Post that:

> Transparency and accountability are hallmarks of representational government in America, a Constitutional Republic. I am sharing this letter with you in that spirit.

The board will meet again next week to consider this
matter. I will share more information as I am able.

151. By stating that he intended to publish the Complaint Letter in the spirit
of transparency and accountability, and by stating that the Board planned to discuss
the contents of the letter in a formal meeting, Defendant Moss implied that the
defamatory statements contained within the Complaint Letter were true and worthy
of public consideration.

152. Furthermore, and in the alternative, because the defamatory statements
were contained within the Complaint Letter rather than Defendant's Facebook Post,
the defamatory statements were not made on an Internet message board, they should
not be presumed to be statements of Defendant Moss's opinion.

153. A number of the Defamatory Statements constitute accusations by
Defendant Moss that Plaintiff had engaged in criminal activity.  Specifically, (a) the
various defamatory statements that Plaintiff threatened to beat Jack Jordan to death
constitutes an accusation that Plaintiff had committed the crime of assault against
Jack Jordan; (b) the defamatory statement that Plaintiff intentionally lied during the
"Hambley hearing" constitutes an accusation that Plaintiff had committed the crime
of perjury.

154. Statements imputing the commission of a crime constitute defamation
*per se*. M.C.L. § 600.2911(1); *Hope-Jackson v. Washington*, 311 Mich. App/ 602,
620-621 (2015).

155.   In relation to the statements imputing the commission of battery and perjury to Plaintiff, Defendant Moss's publication of those statements constitutes defamation *per se*.

156.   Because of Defendant Moss' conduct, Plaintiff has suffered significant damage to his reputation.

157.   The Complaint Letter and the Defamatory Statements have been cited in a litany of news publications including those described in this Complaint.

158.   Defendant Moss knew or should have known that the Defamatory Statements within the Complaint Letter were false.

159.   By publishing the Defamatory Statements within the Complaint Letter and through the Facebook Post, Defendant Moss knowingly made false statements or made false statements with a reckless disregard for the truth.

160.   Defendant Moss is an agent of the Board and therefore his actions are imputed to the Board.

161.   The Board was either responsible for defaming Plaintiff or complicit in Defendant Moss' actions to defame Plaintiff.

162.   As a direct and proximate result of Defendant Moss's defamatory conduct, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith, and will so suffer in the future.

163. As a further direct and proximate result of Defendant Moss's defamatory conduct, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work and will so suffer in the future, and he will suffer additional damages in the future.

WHEREFORE, Plaintiff John Gibbs requests the following relief from this Honorable Court against Defendants:

a. Declare that the aforementioned practices and actions of Defendants constitutes an unlawful violation of 42 U.S.C. § 1983;

b. Declare that the aforementioned practices and actions of Defendants constitute an unlawful violation of Michigan's Whistleblower Protection Act, MCL 15.362, *et seq.*

c. Declare that the aforementioned practices and actions of Defendant Moss constitute defamation contrary to MCL 600.2911, *et seq.*

d. Award Plaintiff the Severance Payment pursuant to the Employment Agreement;

e. Award Plaintiff compensatory, economic, and noneconomic damages in whatever amount Plaintiff is found to be entitled, including all lost wages and benefits, past and future, in whatever amount he is found to be entitled;

f. Award Plaintiff compensatory damages for monetary and nonmonetary loss in whatever amount he is found to be entitled;

g. Award Plaintiff exemplary and punitive damages in whatever amount he is found to be entitled;

h. Award Plaintiff appropriate equitable relief;

     i.      Declaratory Relief;

     j.      Award Plaintiff reasonable attorney's fees, costs, and interests; and

     k.     Award such other relief as this Court deems just and proper.

Respectfully Submitted,

HURWITZ LAW PLLC

 /s/ *Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
*Attorneys for Plaintiff*

Dated: April 8, 2024

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN GIBBS,

        Plaintiff,                      Case No.

v.                                     Hon.

OTTAWA COUNTY BOARD OF
COMMISSIONERS, and JOE MOSS,
individually,

        Defendants.

---

Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

---

## DEMAND FOR TRIAL BY JURY

    Plaintiff John Gibbs, by and through his attorneys, HURWITZ LAW PLLC,

hereby demands a trial by jury of the issues in the above-captioned cause of action.

                            /s/  *Noah S. Hurwitz*
                            Noah S. Hurwitz (P74063)
                            HURWITZ LAW PLLC
                            *Attorney for Plaintiff*

Dated: April 8, 2024