## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN GIBBS,

       Plaintiff,

v.

OTTAWA COUNTY, and JOE MOSS,
individually,

       Defendants.

Case No. 1:24-cv-357-JMB-RSK

Hon. Jane M. Beckering

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Michael S. Bogren (P34835) |
| HURWITZ LAW PLLC | PLUNKETT COONEY |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |
| 340 Beakes St. STE 125 | 333 Bridge St. NW STE 530 |
| Ann Arbor, MI 48104 | Grand Rapids, MI 49504 |
| (844) 487-9489 | (269) 226-8822 |
| noah@hurwitzlaw.com | mbogren@plunkettcooney.com |

### PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

Plaintiff John Gibbs ("Plaintiff"), by and through his attorneys, HURWITZ LAW PLLC, brings this action against Defendants Ottawa County (the "County") and the Chairman of Ottawa County Board of Commissioners Joe Moss ("Defendant Moss"), and states the following:

### INTRODUCTION

1.      Plaintiff John Gibbs brings this action against Defendants Ottawa County and the Chairman of Ottawa County Board Commissioners Joe Moss ("Defendant Moss") for violations of (a) 42 U.S.C. § 1983 (First Amendment Retaliation); (b) Michigan's Whistleblower Protection Act ("WPA"), MCL § 15.362, *et seq*.; and (c) Michigan's statutory defamation law, MCL § 600.2911, *et seq*.  Plaintiff served as Ottawa County Administrator until being terminated "with cause" on February 29, 2024, after raising a series of concerns that were of grave public importance regarding cronyism and malfeasance by the Board.  To justify Plaintiff's "for cause" termination,

Defendant Moss abandoned rational governance and maliciously published on his own Facebook page a litany of provably false statements about Plaintiff that lack factual support.

## PARTIES AND JURISDICTION

2.      Plaintiff is a resident of Byron Center, Kent County, Michigan.

3.      Defendant Ottawa County is a governmental body established by the Michigan Legislature and is in Ottawa County.

4.      Defendant Joe Moss is the Chairman of the Ottawa County Board of Commissioners.

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

6.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claim.

7.      Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Defendant's place of business is located and where the events giving rise to Plaintiff's claims took place.

8.      At all times material to this Complaint, Defendants acted under color of law, meaning under color of the statutes, codes, ordinances, regulations, policies, customs and usages of the State of Michigan and/or the County of Ottawa, Michigan.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment with the Ottawa County Board of Commissioners

9.      On January 3, 2023, Plaintiff and the Ottawa County Board of Commissioners (the "Board") entered into a contract entitled, "Employment Agreement for Ottawa County, Michigan Administrator" (the "Employment Agreement"), attached as **Exhibit 1**.

2

10. Plaintiff's Employment Agreement states that the County "is authorized to enter into a written employment contract with a person to act as Ottaway County's chief administrative officer, *pursuant to* Act 22 of the Public Acts of 1996, as amended, MCL § 46.11(o), under the title of 'Ottawa County Administrator.' " *Id.*

11. MCL § 46.11(o) provides: "If the county has an appointed county manager or other appointed chief administrative officer or a county controller, the county board of commissioners may enter into an employment contract with that officer. . . . An employment contract under this subdivision must be in writing and must specify the compensation to be paid to the officer, any procedure for changing the compensation, any fringe benefits, and any other conditions of employment.  If the officer serves at the pleasure of the county board of commissioners, the contract must so state and may provide for severance pay or other benefits in the event the employment of the officer is terminated at the pleasure of the county board of commissioners."

12. The language of MCL § 46.11(o) does not set forth the job responsibilities and duties of a county administrator.

13. Exhibit A to the Employment Agreement, entitled "Responsibilities and Duties," states as follows:

> i. The County Administrator shall be responsible for the day-to-day administration of the County of Ottawa, Michigan.
>
> ii. The County Administrator shall supervise the operations and performance of all County departments and department heads, **except elected officials and their officers**, and, with the approval of the Board, appoint and remove all heads of departments, **other than elected officials**.
>
> iii. The County Administrator shall coordinate the various activities of the County and unify management of its affairs.

3

iv.    The County Administrator shall supervise the preparations of filing, or submission, of all reports required of the County by law.

v.     The County Administrator shall supervise the preparations and filing, or submission, of all reports required of the County by law.

vi.    The County Administrator shall be responsible for the future direction of the County by developing a continuing strategic plan of the County and presenting it to the Board for approval.

vii.   The County Administrator shall be responsible for the following fiscal services for the County of Ottawa: Accounting, Accounts Payable, Budgeting, Payroll and Receivables, except to the extent that portions of those responsibilities are assigned, by statute, to other offices or entities.

viii.  The County Administrator shall perform such other duties as the Board may assign.

14.    Pursuant to the express terms of the Employment Agreement, the County hired Plaintiff as Ottawa County Administrator for a period of three years, from January 3, 2023 until January 2, 2026.

15.    The Employment Agreement provides that the County would pay Plaintiff $210,000.00 per year, together with an annual bonus.

16.    Exhibit B to the Employment Agreement, entitled "Fringe Benefits," provides that Plaintiff was to receive from the Board as fringe benefits five weeks of vacation each year, and a motor vehicle allowance of $833.33 per month.

17.    Plaintiff diligently and satisfactorily performed the job duties assigned to him pursuant to the Employment Agreement.

18.    At no point during his employment with the County was Plaintiff subject to any disciplinary action or complaints that he was made aware of.

4

19.     Throughout his employment, Plaintiff excelled in his role and accomplished, *inter alia*:

    a.    Dramatically improved the transparency of the budgeting process by adding additional public budget deliberation meetings;

    b.    Procured long-needed budgeting software to make it easier for staff, commissioners, and the public to view the budget;

    c.    Laid the groundwork for a new, data-driven County Strategic Plan based on metrics;

    d.    Added accountability and transparency to the process of reviewing and approving grants;

    e.    Increased financial transparency by making the complete accounts payable report public;

    f.    Restructured the Capital Improvement Planning process and restructured the Facilities Department to better facilitate maintenance and usage of the County's physical assets;

    g.    Initiated a review of the Southwest Ottawa County landfill to find solutions to the County's $500,000 annual expenditure;

    h.    Streamlined the Communications process and added accountability to County messaging by creating a Communications Department with a Director;

    i.    Staffed the County's new Department of Veterans Affairs with a seasoned U.S. Army veteran who has in his short tenure already improved County efforts for our veterans;

    j.    Upgraded the Executive Assistant position to Senior Executive Aide to the Administrator, giving future Administrators high-level policy support and enabling the Administrator to focus more on big picture items and less on daily minutiae.

**The Employment of Ottawa County Corporation Counsel**

20.     All prosecuting attorneys that serve a county in the State of Michigan, including Ottawa County, are elected officials entrusted by citizens.  MCL § 168.200

21.     In the State of Michigan, the elected prosecuting attorney of a county shall, "in their respective counties, appear for the state or county, and prosecute or defend in all courts of the county, all prosecutions, suits, applications and motions whether ***civil*** or criminal, in which the state or county may be a party or interested."  MCL § 49.153.

22.     However, pursuant to MCL § 49.71, "[t]he board of [commissioners] of any county by a majority vote of the member-select may employ an attorney to represent the county in *civil matters*, whenever the board determines that the prosecuting attorney is unable to properly represent the county. ***Such attorney shall receive such compensation as shall be determined by the board of supervisors***."

23.     On September 12, 2000, the Board of Commissioners for Ottawa County executed a Resolution to "create the office of County Ottawa Corporation Counsel" and "transfer the general civil counsel functions for Ottawa County from the Ottawa County Prosecutor's Office to the Office of Ottawa County Corporation Counsel[.]"  *See* **Exhibit 2**, September 12, 2000 Resolution.

24.     The September 12, 2000, Resolution provides, in relevant part:

> WHEREAS, the Ottawa County Board of Commissioners is authorized by MCLA 49.71; MSA 5.824, to employ an attorney to represent the county in civil matters; and
>
> WHEREAS, the Board believes that this can best be accomplished by transferring the office and duties of civil counsel from the Ottawa County Prosecutor's Office to the position of County Corporation Counsel, under the supervision of the Ottawa County Administrator; and
>
> WHEREAS, Ronald J. Frantz, Ottawa County Prosecuting Attorney, has given consent to this action;
>
> NOW THEREFORE BE IT RESOLVED, that the Ottawa County Board of Commissioners does hereby **create the office** of Ottawa County Corporation Counsel, under the supervision of the Ottawa County Administrator's Office, and does, with the consent of Ronald J. Frantz, Ottawa County Prosecuting Attorney, transfer the

6

general civil counsel functions for Ottawa County from the Ottawa County Prosecutor's Office to the Office of Ottawa County Corporation Counsel, effective September 13, 2000

25.     The Ottawa County Board of Commissions, through the September 12, 2000 Resolution, seemingly attempted to "*create*" a new department entitled, "Office of Ottawa Corporation Counsel."

26.     The powers authorized by law for the Ottawa County Board of Commissioners are set forth in MCL § 46.11.

27.     Under MCL § 46.11, Ottawa County has no power to "create" the Office / Department of Corporation Counsel.  *Cf.* MCL § 45.563(e).

28.     Ottawa County does not operate under an optional unified form of county government under MCL § 45.551.

29.     In an optional unified form of county government, the board of commissioners has the power to, *inter alia*, "[a]dopt and enforce rules establishing and defining the authority, duties, and responsibilities of county departments and offices" and "[c]onsolidate county departments or transfer functions from 1 department to another pursuant to section 14 [*i.e.*, MCL § 45.564.]"  MCL § 45.556(n), (o).

30.     MCL § 45.564 provides:

Except as to a department headed by elected county officials or the board of county road commissioners, the board of county commissioners may:

(a) Upon a majority vote and the affirmative recommendation of the county manager or elected county executive, and following a public hearing, the board may consolidate departments completely or in part, or may transfer a function from 1 department to another; or the board may upon an affirmative vote of 2/3 of its members and following a public hearing, consolidate departments completely or in part, or may transfer a function from 1 department to another.

7

(b)  Create additional departments

(c)  Require the county manager or elected county executive to serve
     as a director of a department.

31.    Pursuant to MCL § 45.563(e), an optional unified form of county government may, "[s]ubject to the authority of the county manager or elected county executive," adopt "the department of corporation counsel."  "The department of corporation counsel if adopted shall perform as provided by law all civil law functions and provide property acquisition services for the county as provided by law."  *Id*.

32.    In contrast, because Ottawa County does not utilize an optional unified form of county government, the Ottawa County Board of Commissioners can only exercise powers authorized by MCL § 46.11, which does not include the powers to consolidate departments, create additional departments, and/or require a county administrator to serve as a director of a department.

33.    Thus, corporation counsel did not automatically come under the control and supervision of Plaintiff because he was not a "county manager" or "county executive" in an optional unified form of county government.  *Cf. Bay Cnty. Exec. v. Bay Cnty. Bd. of Comm'rs*, 129 Mich. App. 707, 714-15, 342 N.W.2d 96, 99 (1983).  If Ottawa County operated under the terms of the optional unified form of county government act, the department of corporation counsel would automatically come under the control of a "county manager" or "county executive":

> M.C.L. § 45.554; M.S.A. § 5.302(54) provides that when the optional unified form of county government becomes effective, the powers vested in an abolished department become general government  powers and are administered by the county executive in the manner determined by the county board of commissioners.

> M.C.L. § 45.563; M.S.A. § 5.302(63) provides that the unified county government shall have all the functions, except where otherwise allocated by this act, performed by one or more

8

> departments of a county or by the remaining boards, commissions or authorities.
>
> The statutes clearly establish that the office of civil county counsel is one of the appointed boards, commissions, authorities, departments or elected officials abolished by M.C.L. § 45.554; M.S.A. § 5.302(54).  If it is to exist, then it must be as a function performed by "1 or more departments of the county."  The function need not be performed, as is made clear by M.C.L. § 45.562(1)(d); M.S.A. § 5.302(62)(1)(d), and the county may continue to have its civil legal work performed by the prosecuting attorney.  However, if the county elects to have civil counsel other than the prosecuting attorney, the county must set up the department under the same governmental structures that exist for all other county departments.

*Bay Cnty. Exec.*, 129 Mich. App. at 714–15.  No such department of corporation counsel can be adopted in Ottawa County via the powers of county board of commissioners.  MCL § 46.11.

34.    In Ottawa County, upon the transfer of powers vested in the prosecuting attorney to handle civil counsel functions, the attorneys employed as corporation counsel serve in the capacity as *officers* to elected officials (*i.e.*, the Board of Commissioners).  MCL § 49.153.

35.    Ottawa County Resolution 95-38—the Resolution adopted on January 3, 2023 to hire Plaintiff as County Administrator—supersedes and repeals the September 2000 Resolution because they are in conflict.  Resolution 95-38 provides that "all resolutions and parts of resolutions insofar as they conflict with this Resolution [95-38] are hereby repealed."  The September 2000 Resolution conflicts with Plaintiff's Employment Agreement because he is not permitted to "supervise the operations" of "elected officials *and their officers*."  The attorneys employed as corporation counsel serve as officers to elected officials (*i.e.*, the Board of Commissioners); thus, Plaintiff, as County Administrator, lacks authority to supervise the operations of corporation counsel.

9

36.     Plaintiff's responsibilities and job duties described in Exhibit A of the Employment Agreement are facially void of any reference to *hiring or firing* the County's Corporation Counsel. Instead, pursuant to MCL § 49.7, only the Ottawa County Board of Commissioners shall "employ" Corporation Counsel.

37.     Plaintiff's responsibilities and job duties described in Exhibit A of the Employment Agreement are facially void of any reference to determining or recommending the *compensation* provided to the County's Corporation Counsel.

38.     Plaintiff's Employment Agreement does not reference the September 12, 2000 Resolution (executed 23 years prior to Plaintiff's employment with the County).  Nor does Plaintiff's Employment Agreement explicitly state that the September 12, 2000, Resolution is incorporated into Plaintiff's responsibilities and duties.

39.     The September 12, 2000 Resolution does not express an indefinite determination that all elected prosecuting attorneys succeeding Mr. Frantz are unable to properly represent Ottawa County in civil matters.

40.     Mr. Frantz, Ottawa County's longest-serving prosecuting attorney, retired in December 2020 after holding the position for 30 years.

41.     The current prosecuting attorney for Ottawa County is Lee F. Fisher, who was elected in November 2020.

42.     Thus, upon the election and installment of Mr. Fisher into the position of Ottawa County prosecuting attorney, he was obligated to represent the County in all civil matters, subject to the exception provided in MCL § 49.71, permitting the Board of Commissioners to retain outside counsel upon determining that the prosecuting attorney is unable to properly represent the county.

10

43.     On January 3, 2023, the first day of Plaintiff's employment as County

Administrator, the Board of Commissioners adopted a Resolution, attached as **Exhibit 3**, which

provides:

> WHEREAS, the Ottawa County Board of Commissioners, pursuant
> to MCL § 46.3 and MCL § 46.13a, is authorized to appoint
> representatives, agents and employees for its county as may be
> deemed necessary by it; and,
>
> WHEREAS, employee Doug Van Essen has provided legal counsel
> to the County of Ottawa; and,
>
> WHEREAS, Doug Van Essen has filled the role of "Corporation
> Counsel" for the County of Ottawa, at the pleasure of the Board of
> Commissioners, and will transition corporate counsel in cooperation
> with and under the lead of Kallman Legal Group in fully
> transitioning corporate counsel to Kallman legal Group on or before
> February 28, 2023; and,
>
> WHEREAS, Doug Van Essen indicated in writing on December 22,
> 2022, his intent to retire on January 1, 2023; and,
>
> WHEREAS, Doug Van Essen has served the County of Ottawa for
> decades and is committed to services, and providing legal advice to,
> the Board of Commissioners; and
>
> NOW THEREFORE BE IT RESOLVED, that the Ottawa County
> Board of Commissioners appoints Kallman Legal Group, PLLC
> ("Kallman Legal Group") as interim corporate counsel to the Board
> of Commissioners; and
>
> BE IT FURTHER RESOLVED, that Kallman Legel Group will
> present a proposed contract for legal services to the Board of
> Commissioners within seven (7) days; and,
>
> BE IT FURTHER RESOLVED, that Kallman legal Group will be
> paid their standard hourly billing rate for services rendered until
> such time as a contract is finalized[.]

44.     The January 3, 2023 Resolution does not instruct that Kallman Legal Group, PLLC,

as interim corporate counsel to the Board of Commissioners, is supervised or directed by Plaintiff

as the County Administrator.

45.     On January 10, 2023, the Ottawa County Board of Commissioners approved by a 6-5 vote to employ Kallman Legal Group, PLLC, a law firm headquartered in Lansing, Michigan, and operated by attorney David Kallman, as its Corporation Counsel.

46.     Plaintiff was not asked by the Board of Commissioners to recommend compensation and benefits for the employment of Kallman Legal Group, PLLC.

47.      Plaintiff was not involved in the negotiation or presentation of the contract with Kallman Legal Group, PLLC.

48.     The selection of Kallman Legal Group, PLLC as Corporation Counsel for Ottawa County was received by the public with exceptional concern.  Namely, there was (a) no open bidding procedure to screen other law firms; and (b) Ottawa County residents commented on a perceived conflict-of-interest between Defendant Moss and Kallman Legal Group, PLLC.

49.      On January 9, 2023, The Holland Sentinel reported:

> **[T]he board didn't open up the bidding/application process to other firms to compete.  And, perhaps more problematic, the two primary attorneys of Kallman Legal Group – David A. Kallman and Stephen P. Kallman – are related to board chair Joe Moss' business partner, Joel Kallman.**  Joel Kallman is listed on LinkedIn as an employee or proprietor of Moss' three businesses: Freshphone, Eclarian and Afterburner.  He is the nephew and cousin, respectively, of the lawyers at Kallman Legal Group.[1]

50.     On January 10, 2023, MLive Media Group reported:

> Those who voted against contracting with Kallman Legal Group largely did so in hopes of fielding other candidates for the job and proposed a failed motion to seek other candidates through Feb[ruary] 28. . . . Ottawa County Commissioner Rebekah Curran on Tuesday raised concerns about the lack of transparency

---

[1] Sarah Leach, Ottawa County meets again Tuesday.  Here's what to expect after bombshell changes, The Holland Sentinel, https://www.hollandsentinel.com/story/news/politics/government/2023/01/09/ottawa-county-meets-again-tuesday-heres-what-to-expect-after-bombshell-changes/69789303007/.

surrounding the selection of Kallman Legal Group.  She additionally said she's heard concerns about Kallman Legal Group's qualifications. . . . **Kallman Legal Group does not list municipal law among its practice areas,** and its experience in the area was questioned on Tuesday [January 10, 2023] by Republican Commissioner Roger Bergman . . . **Concerns about a conflict of interest between Kallman Legal Group and Ottawa County Board Chair Joe Moss, who is president of Ottawa Impact, have also been raised.  Moss is business partners with Joel Kallman, who is related to the two primary attorneys at Kallman legal Group, according to the Holland Sentinel**.  'There is no conflict of interest, but thank you for asking,' Moss told reporters Tuesday.[2]

51.    On January 10, 2023, Bridge Michigan reported:

On Tuesday [January 10, 2023], county commissioners voted 6-5 to hire Kallman Legal Group. . . **The vote came amid conflict of interest claims and transparency concerns from other commissioners and the public.  The hire was approved without competitive bidding process – one required by the county's purchasing policy – and despite concerns that state records indicate commission chair Joe Moss is a business partner with the brother of two Kallman attorneys.**

            *       *       *

Under Ottawa County procurement rules, any purchases above $20,000 must go through a competitive sealed bidding process or a request for proposal.  Each process requires advanced public notice.  Contracts can be awarded without the bidding process if it's a 'sole source' contract – meaning there is only one vendor qualified to do the job – or if it's an emergency where there is a threat to the public welfare, health or safety, or doing so is 'in the county's best interest,' according to the rules.

            *       *       *

**Some commissioners *and residents* also questioned whether Moss should have recused himself from voting for Kallman's hiring due to a potential conflict of interest.**  Moss is listed as the treasurer of Jenison-based company Freshphone, according to state filings.  Joel Kallman – president of the company – is related to

---

[2] Michael Kransz, <u>New corporate counsel narrowly approved as part of Ottawa County government shakeup</u>, MLive, https://www.mlive.com/news/grand-rapids/2023/01/new-corporate-counsel-narrowly-approved-as-part-of-ottawa-county-government-shakeup.html.

David Kallman and Stephen Kallman, two major attorneys at
Kallman Legal Group, the Holland Sentinel reported.

*       *       *

Moss' relationship with Kallman, the lack of open bidding process
as well as the board's swift Jan[uary] 3 decisions ***sparked protests
from some county residents***, while others cheered on the board for
keeping their campaign promises.  More than 500 comments were
submitted to the county following the Jan[uary] 3 meeting, with
some expressing anger toward the board's decisions and others
praising the new commissioners.[3]

52.     On January 10, 2023, Michigan Public (NPR) reported:

Ottawa County Commissioners approved a no-bid contract worth
more than $580,000 at a meeting on Tuesday, despite some concerns
from residents and commissioners over transparency and a potential
conflict of interest.

*       *       *

And it came despite concerns from some commissioners and
residents that the process lacked transparency, and didn't include a
typical request for proposal, which would have given other law
firms an opportunity to bid for the contract.

*       *       *

**Residents said they were also concerned about connections
between Kallman legal Group and Joe Moss**, the current board
chair and co-founder of Ottawa Impact PAC.  Moss's business
partner is Joel Kallman, who is the nephew of David Kallman, the
head of Kallman Legal Group.  Joel Kallman also played a key role
in Ottawa Impact PAC during the election that brought many of the
current board members into power.  Campaign finance records show
**Ottawa Impact PAC raised more than $100,000 during the 2022
election, and more than $60,000 of the money it spent went to a
company called For Liberty LLC** for web hosting, bookkeeping
and other services.  At least seven of the current board members
elected with the support of Ottawa Impact PAC received web
support from For Liberty LLC, with Ottawa Impact PAC funds.

---

[3] Yue Stella Yu, Ottawa County hires law firm that sought to void 2020 election, Bridge Michigan,
https://www.bridgemi.com/michigan-government/ottawa-county-hires-law-firm-sought-void-
2020-election.

**State Business records list Joel Kallman as the resident agent for For Liberty LLC**.  He's also the agent for Roosted LLC, which received $1,800 from Ottawa Impact PAC for rent at its offices at 517 Baldwin St. in Jenison.  That's also the same address listed for For Liberty LLC and Freshphone.

On LinkedIn, Joel Kallman is listed as CEO of Freshphone, and Joe Moss, the new chair of the Ottawa County Board of Commissioners is listed as its CFO.

During Tuesday's meeting [on January 10, 2023] as **commissioners prepared to vote on the $580,320 contract awarded to Joel Kallman's family members**, commissioner Roger Bergman raised the issue of a possible conflict of interest.

'Mr. Chairman, I would like to ask if there's any on the board who have a potential conflict of interest, that they abstain from voting,' Bergman said.

'Is there anyone on the board who has a potential conflict of interest?' Moss responded, looking around at the other commissioners.

Moss didn't abstain.  The contract with Kallman Legal Group was approved by a one-vote margin, with five commissioners voting against it.  **"There was a clear, clear, clear conflict of interest," said resident Oliver Shampine, during a public comment portion of the meeting after the vote.**  "So that's just beyond disappointing."[4]

### Plaintiff's Complaints Regarding the Corporation Counsel

53.     The reality of Plaintiff's employment responsibilities and duties as County Administrator is that he lacked authority to supervise, hire, fire, determine compensation, discipline, or evaluate the performance of Kallman Legal Group, PLLC as Corporation Counsel for Ottawa County.

---

[4] Dustin Dwyer, New Ottawa County board members award no-bid contract to law firm with ties to board chair, Michigan Public, https://www.michiganpublic.org/politics-government/2023-01-10/new-ottawa-county-board-members-award-no-bid-contract-to-law-firm-with-ties-to-board-chair.

54.     Plaintiff was not responsible for the delegation of duties or assignments to Corporation Counsel.  Instead, attorneys within Kallman Legal Group, PLLC, Jack Jordan and Lanae Monera, would meet with David Kallman to determine whether to address any civil legal issues within Ottawa County.  Then, Mr. Jordan and Ms. Monera would call the Board Chair and Vice Chair of the Board of Commissioners and offer legal advice.  Plaintiff was not invited to attend those calls with the Board Chair and Vice Chair.

55.     Mr. Jordan verbally stated to Plaintiff, "We do not report to you.  We report to the Board."

56.     Plaintiff was not required to keep records or perform bookkeeping of the invoices sent by Corporation Counsel.

57.     Plaintiff was not responsible for or required to provide formal reports to the Board of Directors on the assignments or legal opinions and findings of Corporation Counsel.

58.     Plaintiff's ordinary job responsibilities and duties required him to meet with other department directors within Ottawa County at least once a month.  However, Plaintiff never held monthly meetings with Corporation Counsel because the attorneys of Kallman Legal Group, PLLC told Plaintiff that they "report to the board."

59.     If Plaintiff requested a meeting with Corporation Counsel, Plaintiff's request was ignored.

60.     Plaintiff was not responsible for or required to provide formal performance evaluations of Corporation Counsel.

61.     Plaintiff was not responsible for instructing or requesting Corporation Counsel to waive any of its legal fees billed to Ottawa County.

62.     On or about March 10, 2023, Plaintiff sent an email to Mr. Kallman, Mr. Jordan Ms. Monera, Defendant Moss, and Vice Chair Sylvia Rhodea (the "March 10 Email").

63.     In the March 10 Email, Plaintiff explained three specific concerns about the Corporation Counsel's performance, namely (1) the insufficient availability of legal counsel with the effect that Plaintiff was often left without legal advice; (2) the complete lack of any system with which to track legal deliverables, with the effect that requests for legal service were left outstanding for long periods of time; and (3) the competency of the Corporation Counsel to give appropriate legal advice.

64.     Plaintiff's March 10 Email provided actionable and reasonable solutions to each problem asserted.

65.     Specifically, Plaintiff wrote as to the insufficient availability of legal counsel:

> **Problem 1: Availability**
> Issue: On Wednesdays and Fridays, I'm largely without legal answers. I need at least one legal person available by phone or in the office every day of the week, as soon as is feasible.
>
> Proposed Solution 1: Have someone on call Wednesdays and Fridays.
>
> Proposed Solution 2: Have at least one person physically in the office M-F.

66.     Plaintiff wrote as to the Corporation Counsel's deliverables tracking.:

> **Problem 2: Tracking Deliverables**
> Issue: There is no system for tracking deliverable, and as such, there is mostly never any follow up on items requested.
>
> Proposed Solution: Start with the below, which I'll put into a shared spreadsheet, and we can expand upon it next week

67.     Beneath this statement, Plaintiff provided a table of tasks for the Corporation Counsel.

68.     Plaintiff wrote as to the quality of the Corporation Counsel's advice:

**Problem 3: Getting Answers**

Issue: When I have a legal question, the answer can never be "I don't know".  If none of us knows the answer, I need to be given a path by which I can get an answer in a timely manner, even if I need to ask an outside source.

Proposed Solution: Ask Dave [Kallman] for advice/recommendations if neither counsel or myself know the answer.

69.     Plaintiff's speech in the March 10 Email addresses the ability and capacity of the County's Corporate Counsel to provide appropriate and timely legal advice to the County and the execution of its public duties.

70.     None of the concerns Plaintiff raised in the March 10 Email were addressed by Corporation Counsel, which is indicative of the fact that Corporation Counsel does not actually adhere to any purported supervisory capacity of Plaintiff as County Administrator.

71.     Plaintiff continued to work diligently and competently in his role.

72.     During this period, Plaintiff received no complaints about his performance from the Board, Defendant Moss, or any other person.

73.     Ottawa County never indicated that Plaintiff's performance as County Administrator fell below standards during this time.

74.     On July 18, 2023, Plaintiff sent a letter to the following recipients: Defendant Moss; Ms. Rhodea; Mr. Kallman; Commissioner Roger Belknap, Chair, Planning and Policy Committee; Allison Miedema, Chair, Talent and Recruitment Committee; and Commissioner Gretchen Crosby, Chair, Finance and Administration Committee.

75.     Plaintiff's July 18, 2023 letter detailed the extensive deficiencies in the Corporation Counsel's performance (the "Deficiency Letter").

76.     The Deficiency Letter provides, in pertinent part:

18

**I do not have confidence in the ability of the Office of Corporation Counsel to fulfil its duties to the County**.

*    *    *

I worked for four years in the U.S. Department of Housing and Urban Development, including as an acting Assistant Secretary for Community Planning and Development. During my time in government leadership, I interacted closely with legal counsel on a highly frequent basis. Those interactions have made me familiar with the proper functioning of an office of legal counsel or corporation counsel. I am acquainted with the myriad of functions that must be performed by such an office [*i.e.*, corporation counsel], including, but not limited to, responding to FOIA requests, reviewing contracts, providing legal opinions on proposed policy changes, providing legal review of proposed Board actions, attending internal and external meetings where legal issues are at play, handling litigation, and other duties.

It is with that experience that I inform you of my judgment that **the Office of Corporation Counsel in its current state is not able to effectively perform the above functions, and is thus ill-positioned to serve you or the County**.

<u>**The Problems**</u> (emphasis in original)

• A County Commissioner was given totally incorrect advice by Counsel, causing an issue that should have been handled internally by the Board of Commissioners to be sent to outside Counsel, at cost to the County, and at the potential for litigation that could have been avoided if the issue had been handled internally. Importantly, Counsel did not consult with the Board Chair and Vice Chair – or any other member of the Board for that matter – nor with the County Administrator, prior to making this erroneous decision. **The continued risk that this method of operation poses to the County cannot be emphasized too strongly.**

• A sensitive Freedom of Information Act (FOIA) request implicating the privacy of dozens of candidates who applied for a position directly reporting to the County Administrator, was processed without consultation with the County Administrator, the Chair of the Board, or any member of the Board of Commissioners. Decisions of such consequence must be shared with leadership beforehand, as such a decision could have **a chilling effect on applicants to County positions, who now face the potential to be targeted and attacked as the result of their information being released in an inappropriate manner**.

19

• Significant delays in providing responses to routine requests for a legal opinion, often taking several weeks or months for standard requests, if any response is received at all.  This applies not only to requests from the Office of the County Administrator, but also to **requests from numerous County stakeholders, who have informed me in confidence of their concerns, including weeks- or months-long delays and a lack of responsiveness to legal requests**.

• A general lack of organization, including the stark absence of any system to organize, categorize, and track workload and tasks.  This results in requests going unanswered or taking many weeks or months to address.  To address this substantial problem, the County Administrator directed Counsel to adopt a workflow system to organize their work.  However, they refused to do so, and would not meet with the Deputy County Administrator and Director of IT, who were ready and prepared to help them develop such a system at no cost to the County.  Rather, Counsel insisted that they perceived no issues on their end and ignored the County Administrator's request to address the issue.

• In nearly all counties, Corporation Counsel reports to the County Administrator.  This is the industry standard best practice and is also the reporting structure in the most current organizational chart for Ottawa County.  Nonetheless, **Counsel disregards this standard arrangement, and believes that it reports only to the Board of Commissioners**, and not to the County Administrator.  This results in Counsel routinely disregarding directives and deadlines from the County Administrator, and failing to inform the Administrator on significant issues, **due to a belief that they are not accountable to the County Administrator.**  This leaves the administrator unable to correct problems in the conduct of Counsel, or direct their activities.  The County Administrator, who is in the office daily and thus best positioned to supervise the day-to-day activities of Counsel, must have disciplinary oversight over that office, as is the standard in nearly all Counties.

• Counsel works only three days per week, which is not enough to manage its workload.  When the County Administrator brought this to the attention of Counsel, they indicated that they did not perceive this to be a problem and refused to consider suggestions from the County Administrator for increasing their work capacity.

• Counsel is unable or unwilling to write professional legal memos to deliver opinions and analyses.  The use of legal memos to convey a response to a legal inquiry is the standard practice [in] public policy.  This is because a legal memo allows legal counsel to deliver

analyses clearly and concisely, to reference the relevant statutes, case law, and comparable situations in the footnotes or inline comments, and to redline changes to proposed policy documents so that edits can clearly be seen and resolved. Instead, Counsel only gives opinions orally, or in very short, informal written responses, with no supporting statutory or case law references. This approach of providing only incomplete, informal responses makes it difficult to create policy.

• **Counsel lacks experience in municipal law and in the practice of providing legal counsel to government policymakers**. **This results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information. It also results in erroneous legal opinions**. As an example, the one and only time that the County Administrator received a legal memo from Counsel when one was requested, it contained an erroneous legal analysis pertaining to a major item before the Board of Commissioners, causing significant embarrassment.

• **Corporation Counsel often responds to a request for an opinion or analysis with "I don't know." It is far outside of professional standards for Counsel to respond with "I don't know", when asked for a legal opinion or analysis by County leadership or County stakeholders**. Rather, the industry standard practice is for a firm providing Counsel services to leverage the resources of their firm, and if necessary, the extended networks connected to it, to do what it takes to get an answer in a timely manner.

• Significant spelling, formatting, and grammatical errors occur in official documents, requiring the County administrator to review and edit the documents prior to approval. Counsel refuses to use Track Changes, the industry standard practice for communicating changes to documents, to indicate and redline changes made to a document.

In an effort to address these issues, I have brought the above problems to the attention of Counsel on numerous occasions, both in writing an in person, even all the way up to the top leadership of the firm which provides the County's Corporation Counsel services. But each time, these concerns were quickly rejected, and no corrective action was taken. **With Counsel unresponsive to my attempts at corrective oversight and unwilling to acknowledge any problems or improve their performance, I am now left with no other recourse but to ask you, the Board of Commissioners, to take action, to prevent any further risk to the County**.

**The Solution** (emphasis in original)

In contrast to the significant problems in the areas outlined above, it is my judgement that the firm providing Corporation Counsel services is properly and correctly handling matters of litigation involving the County Board of Commissioners.  Therefore, I propose that the firm currently providing Corporation Counsel services now handle only litigation services, and will no longer handle, nor be paid for, any non-litigation services.

Additionally, in order to conform to the standard used by nearly all counties, and to conform to the existing organizational chart for Ottawa County, I request that the firm currently providing Corporation Counsel services now report directly to the County Administrator.

\*       \*       \*

I would be happy to lead the search for new Corporation Counsel, who would replace the non-litigation responsibilities which the firm currently providing Corporation Counsel services would be required to relinquish.  Any new Corporation Counsel must be deeply steeped in municipal law as well as experienced in providing legal counsel to government policymakers.

It is important to note that my analysis does not reflect upon the individual character of the persons or firm that currently comprise the Office of Corporation Counsel.  Nor does it reflect upon any problem with any said individuals on a personal level.  Rather, this analysis is strictly professional in nature, focusing narrowly on the functioning of the Office of Corporation Counsel.  It is not meant to denigrate any person, persons, or firm.

I hope to meet with you on Tuesday, July 25th, prior to the Board of Commissioners meeting at 4 PM, to discuss an action plan based on the above.

Thank you for your consideration of this critical problem. I look forward to discussing this issue soon.

77.     The Deficiency Letter addressed shortcomings in the Corporation Counsel's exercise of its public functions.  Plaintiff's statements within the Deficiency Letter constitute a legitimate public concern with the operation of the Corporation Counsel in its service to Ottawa County.

78.     Plaintiff did not write the Deficiency Letter because it is part of what he, as County Administrator, was employed to do.   Rather, Plaintiff explained it is his experience in *other* government leadership positions that informed his judgment regarding Corporation Counsel; Plaintiff was uniquely equipped with information to explain the erroneous legal opinions of Corporation Counsel that impacted the public body; Plaintiff expressed concern over the privacy of citizens in Ottawa County "who now face the potential to be targeted and attacked as a result of their information being released in an inappropriate manner"; Plaintiff voiced concern on behalf of "County stakeholders" that informed Plaintiff "in confidence of their concerns"[5]; Plaintiff explained that Corporation Counsel reports only to the Board of Commissioners; Plaintiff echoed the concerns of the public that Corporation Counsel lacks legal experience in municipal law; and because Corporation Counsel was "unwilling to acknowledge any problems or improve their performance," Plaintiff was left "with no other recourse" but to ask the Board of Commissioners "to take action, to prevent any further risk to the County."

79.     Ergo, the Deficiency Letter asserts speech about the Corporation Counsel's inept competency to perform public governmental functions—for example, "the Office of Corporation Counsel in its current state is not able to effectively perform [its public functions] and is thus ill-positioned to serve [the Board of Commissioners] or the County."

80.     Plaintiff's speech in the Deficiency Letter does not address any private concerns of Plaintiff whatsoever.

81.     Plaintiff's speech in the Deficiency Letter asserted that he has no personal animosity towards Corporation Counsel.

---

[5] The statement "County stakeholders" refers to department directors and members of the public that voiced concern to Plaintiff regarding Corporation Counsel.

82.     Plaintiff did not, nor could he, gain any personal advantages by asserting his speech.

83.     Plaintiff's speech erodes public trust in the competency of Ottawa County Corporation Counsel.

84.     Plaintiff's speech erodes public trust in the Board of Commissioners for employing Kallman Legal Group, LLC as Corporation Counsel.

85.     Plaintiff's speech brought to light the potential or actual wrongdoings or a breach of the public trust in the Ottawa County Board of Commissioners and Kallman Legal Group, PLLC as its Corporation Counsel.

86.     Plaintiff's speech touched on the public concern of Kallman Legal Group, PLLC's fitness to serve as Corporation Counsel for Ottawa County.

87.     A very specific public concern asserted by Plaintiff's speech is that "**Counsel lacks experience in municipal law and in the practice of providing legal counsel to government policymakers**."[6]

88.     Plaintiff's speech therefore touched on the public concern of Corporation Counsel's legal competence, which is the very first rule of the Model Rules of Professional Conduct: "A lawyer shall provide competent representation to a client.  Competent representation requires legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Model R.  Prof'l. Cond. 1.1: Competence.  Likewise, "A lawyer shall not: (a) handle a legal matter which the lawyer knows or should know that the lawyer is not competent to handle, without associating with a lawyer who is competent to handle it; (b) handle a legal matter without

---

[6] Municipal law is not listed within the "practice areas" of Kallman Legal Group, PLLC on its website.  Kallman Legal Group, PLLC, https://www.kallmanlegal.com/ (last visited June 24, 2024).

preparation adequate in the circumstances; or (c) neglect a legal matter entrusted to the lawyer." Mich. R. Prof'l. Cond. 1.1.

89.     Kallman Legal Group was awarded a **$580,320** contract to serve Ottawa County and its citizens with competent legal representation in civil matters.

90.     Plaintiff's speech further addressed the public concern of Corporation Counsel's legal competence by stating, "**Corporation Counsel often responds to a request for an opinion or analysis with 'I don't know.   It is far outside of professional standards for Counsel to respond with 'I don't know', when asked for a legal opinion or analysis by County leadership or County stakeholders.**"

91.     Plaintiff asserted that Corporation Counsel's repeated failures to provide competent representation "**results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information.   It also results in erroneous legal opinions**."   Hence, Plaintiff's speech touched on the public's concern that Corporation Counsel billed Ottawa County unreasonably due to lack of competency and experience in municipal law.   "A lawyer shall not make an arrangement for, charge, or collect an unreasonable fee or an unreasonable amount of expenses.   The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly . . . (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing legal services…"   Model R. of Prof'l. Cond. 1.5.

92.     Unreasonable delays in legal analysis undermine public confidence in attorney trustworthiness.  "A lawyer shall act with reasonable diligence and promptness in representing a client" and "[e]ven when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness."  Mich. R. Prof'l. Cond. 1.3.

93.     "[S]peech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of public concern through their employment."  *Lane v. Franks*, 573 U.S. 228, 240 (2014).

94.     Plaintiff is not a licensed attorney in any jurisdiction within the United States and has no employment duty to assert speech on attorney ethics.

95.     Plaintiff is not a licensed attorney in any jurisdiction within the United States and has no supervisory capacity to control Corporation Counsel's legal opinions or legal writings.

96.     Plaintiff's ordinary job responsibilities do not include reporting and recommending corrective actions for licensed attorneys, namely the Corporation Counsel of Ottawa County.

97.     The public's tax dollars pay, in part, for Ottawa County's legal fees to Kallman Legal Group, PLLC as Corporation Counsel.

98.     Plaintiff was not making typical employee complaints about his job responsibilities up the chain of command—Plaintiff's speech falls outside the context of employee beefs since he was trying to raise the alarm about attorney ethics and mismanagement of taxpayer dollars with public officials who he believed were in a position to address those concerns.

99.     Prior to sending the July 18 Deficiency Letter, Plaintiff contacted members of the public, including attorneys, to raise concern and inquire whether Corporation Counsel's excessively billed Ottawa County.

100.    Plaintiff also contacted Ottawa County Public Defender Nichole Jongsma-Derks to raise concern over the lack of responsiveness and excessive billing practices of Corporation Counsel.

101.    Plaintiff also contacted Deputy County Administrator and attorney Benjamin Wetmore, regarding the lack of responsiveness and excessive billing practices of Corporation Counsel.

102.    The public's tax dollars pay, in part, for the "erroneous legal opinions" of Corporation Counsel.

103.    Plaintiff learned that the legal memorandums of Corporation Counsel often did not cite legal authority despite billing Ottawa County excessive hours performing legal research.

104.    Plaintiff's speech involves issues for which information is needed to enable the citizens of Ottawa County to make informed decisions regarding their government's operation—specifically, the Board of Commissioners is elected by the public body and entrusted with the authority to hire competent and cost-efficient counsel to represent the County in civil matters, which is funded by taxpayers.  Plaintiff's speech entails matters upon which information is needed to enable members of society to make informed decisions regarding the leadership and operations of elected officials, including the Board of Commissioners.

105.    Plaintiff speech was asserted as a concerned citizen addressing the Board of Commissioners knowingly hiring an incompetent Corporation Counsel because of a perceived conflict-of-interest and mismanagement of public funds.

106.    Plaintiff's protected speech is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.

107.    On March 9, 2024, MLive Media Group reported:

27

Invoices obtained by MLive/The Grand Rapids Press through a Freedom of Information Act request show **Kallman legal Group billed the county and its insurance authority for almost 3,006 hours of work in 2023, resulting in a total charge of $731,755.37**. The bulk of those earnings – $503,392 – was billed directly to the county for 2,237.3 hours of corporation counsel work, which includes attending county board meetings, providing legal opinions to county officials and departments, holding office hours, processing and responding to FOIA requests, ensuring county compliance with state law and more.

**Kallman Legal Group's bill last year for corporation counsel work was more than double the $240,415 the county paid in contracted corporation counsel services in budget year 2022**, the last full year that Doug Van Essen, Kallman Legal Group's predecessor, was contracted in the position.

\*       \*       \*

When Kallman Legal Group was hired on, the county's fiscal services department had estimated an annual bill around $280,800 for corporation counsel work.

The county board had to allocate $110,000 more for Kallman Legal Group's expenses in July 2023, and Ottawa County Board Chair Joe Moss at the time blamed the growing legal costs on the rising number of Freedom of Information Act requests being processed by Kallman Legal Group . . . **The invoices do not specify how many hours each month were devoted solely to processing FOIA requests.**

\*       \*       \*

**The law firm isn't known for, and doesn't list experience in, municipal law necessary for corporation counsel work on its website**. That was a concern raised by several county board members when Kallman Legal Group was hired, and the law firm has come under renewed scrutiny in recent weeks after fired county Administrator John Gibbs alleged the firm gave inaccurate legal opinions and took longer on routine legal work because it lacked legal experience, among other claims.

\*       \*       \*

The remaining $228,363.37 earned by Kallman Legal Group in 2023 was billed to the Ottawa County Insurance Authority for

768.6 hours of litigation work.  While the contract with Kallman Legal Group approved by the county board in January outlines that attorneys will be paid $275 an hour for litigation work, Kallman Legal Group charged $295 an hour for that work throughout all of last year.  It wasn't immediately clear why Kallman Legal Group charged more for those services than the contracted rate.

The Ottawa County Insurance Authority was seeded in the 1990s with county general fund dollars from taxpayers, but the county hasn't allocated more funds to it in years and instead has relied on investment growth to fund the nearly $20 to $25 million reserve, according to county commissioner Doug Zylstra. . .

The biggest litigation cost last year was the county's fight against Administrative Health Officer Adeline Hambley's wrongful termination lawsuit, which was brought after Ottawa Impact county commissioners voted to replace her without cause.

*       *       *

**Zylstra said that lack of experience in municipal law may have resulted in increased billing hours**.  "Everybody can learn, but learning is not free, and education takes time and that's going to cost Ottawa County residents for our new lawyers to get up to speed," Zylstra said. "Again, no knock on Lanae or Jack, but it is what it is: if you don't have the experience, you need to gain the experience and it's going to take some time to get that, and that's going to cost a little bit in billings."[7]

### Defendants Retaliated Against Plaintiff

108.    On July 21, 2023, Plaintiff met with Defendant Moss, Ms. Rhodea, Commissioners Roger Belknap, Allison Miedema, Gretchen Cosby, Mr. Kallman, Mr. Jordan, and Steven Kallman (another attorney employed by the Kallman Legal Group, PLLC).

109.    The purpose of the meeting was to discuss the Deficiency Letter.  However, Plaintiff's concerns regarding the Corporation Counsel's performance were not addressed during

---

[7] Michael Kransz, <u>Conservative law firm earned $730K as Ottawa County's new attorney, invoices show</u>, MLive, https://www.mlive.com/news/grand-rapids/2024/03/conservative-law-firm-earned-730k-as-ottawa-countys-new-attorney-invoices-show.html.

the meeting, and instead David Kallman insulted Plaintiff and accusatorily stated that the true purpose of the Deficiency Letter was for Plaintiff to seize power within the County.

110.   During the meeting, the Board stated that Plaintiff was "possessed by the devil."

111.   The Board did not investigate Plaintiff's whistleblower concerns.

112.   On October 24, 2023, a lawsuit was filed against the Board and Plaintiff alleging, *inter alia*, that Plaintiff had unlawfully discriminated against an applicant for employment with the County (the "*Kimball*" matter).

113.   The next day, October 25, 2023, Plaintiff was instructed by Defendant Moss that Plaintiff should stop communicating with members of the Board, restricting Plaintiff's ability to perform his duties.

114.   On November 6, 2023, the Board held a closed meeting to discuss Ottawa County Health Officer Adeline Hambley's severance payment because of a lawsuit filed by Ms. Hambley (the *"Hambley"* matter).

115.   During this meeting, the Board reached a general agreement to pay Ms. Hambley $4.0M in exchange for Ms. Hambley's resignation.

116.   Plaintiff had no say to authorize the settlement.  However, Plaintiff outspokenly protested the decision as a gross misuse of taxpayer funds.

117.   The proposed $4.0M settlement out of taxpayer funds was a topic of public concern. On November 8, 2023, FOX 17 reported:

> Multiple sources confirm to FOX 17 that Ottawa County will pay $4 million to Health Officer Adeline Hambley.  In exchange, she'll drop her lawsuit against the county and step down as health officer.

*         *         *

30

According to a source, this could be the largest payout in Ottawa County's history.  FOX 17 was told in the last 30 years, the county hasn't paid a combined $2 million in litigation claims.

*        *        *

Commissioner Jacob Bonnema gave FOX 17 the following statement Wednesday:

*Today Ottawa County Residents are learning that they got a raw deal.  The decision by Ottawa Impact to payout Adeline Hambley goes against every principle of good governance and fiscal conservatism.*

*First, it is a severe abuse of the taxpayers, who are now compelled to pay this exorbitant settlement to one person and get absolutely nothing in return.*

*Second, Ottawa County taxpayers now have to pay Mrs. Hambley as well as the salary of the full-time director who replaces her.* ***Double pay for half the work is the pattern of behavior for staffing decisions by Ottawa Impact commissioners.***

*Finally, the speed at which this decision as made and the Ottawa Impact commissioner's willingness to go along with this, with no checks or balances, is wholly irresponsible and begs the question, "why"?*

*The opportunity costs of this decision will have lasting effects, because $4 million is a lot of money!  Consider what could have been done with $4 million to help our neighbors.  How many roads could we have plowed?  How many park paths or benches could we maintain or improve?  How many sheriff cruisers could we buy or deputies could we employ to keep us safe?*

*        *        *

Due to this legal case, the Kallman Legal Group billed the Ottawa County Insurance Authority $82,686 from February to August of this year.  FOX 17 has FOIA'd the August-through-October billing from Corporate Council.[8]

---

[8] Matt Witkos, <u>Ottawa County looks to spend $4M to end health officer's case against the county,</u> FOX 17, https://www.fox17online.com/news/local-news/lakeshore/ottawa/ottawa-county-looks-to-spend-4m-to-end-health-officers-case-against-the-county

118.    On January 9, 2024, Plaintiff met with Defendant Moss and Ms. Rhodea, at which time Defendant Moss and Ms. Rhodea asked Plaintiff to resign from his position, stating that his resignation would secure a settlement in the *Kimball* lawsuit.

119.    Upon information and belief, Plaintiff's resignation has never been a negotiable settlement term in the *Kimball* lawsuit.

120.    Plaintiff refused to resign during the January 9, 2024 meeting.

121.    Although Defendants asked Plaintiff to resign, at no point during the January 9, 2024, meeting did Defendants criticize Plaintiff's performance.

122.    On January 12, 2024, Defendant Moss telephoned Plaintiff and again requested that he resign.  Defendant Moss did not criticize Plaintiff's job performance during the call.

123.    Plaintiff perceived and suspected Defendants' requests for him to resign as violations of law.

124.    Plaintiff suspected that Defendants' requests for Plaintiff to resign were retaliatory and violated the law; therefore, Plaintiff reported suspected violations of law to his attorneys.

125.    Upon information and belief, Defendant Moss is a business partner with family members of the Kallman Legal Group, and Ms. Rhodea has personal connections with the firm.

126.    Defendants are motivated by personal interests to retain the Kallman Legal Group, PLLC as the County's Corporation Counsel and retaliated against Plaintiff for criticizing the firm.

127.    On January 15, 2024, Plaintiff attended an Insurance Authority meeting with Defendant Moss, Ms. Rhodea, and Ms. Cosby.

128.    During this meeting, Plaintiff protested the Board's decision to pay Ms. Hambley a $4.0M settlement for her resignation.  Plaintiff did so in a professional manner and did not raise his voice.

129.   That same day, January 15, 2024, Plaintiff's prelitigation counsel sent the Board a letter explaining that the Board had no cause to terminate Plaintiff or to request his resignation.

130.    Moreover, the January 15, 2024 letter from Plaintiff's prelitigation counsel stated, "be advised that the full extent of legal options available to Mr. Gibbs will be used to ensure the Board ceases to violate Mr. Gibbs' constitutional, statutory, and contractual rights any further than it already has to date" and "[t]o be clear, there is no scenario where the Board's adverse conduct against Mr. Gibbs is not put under a microscope by a court of competent jurisdiction if it does not regain its senses and begin treating Mr. Gibbs with dignity."

131.   On February 15, 2024, Plaintiff's litigation counsel sent a letter to the Board explaining in detail Defendants' violations of law, including Plaintiff's First Amendment rights, 42 U.S.C. § 1983, and Michigan's Whistleblower Protection Act.

132.   On February 21, 2024, Plaintiff received a written "Notice" from the Ottawa County Clerk/Register of Deeds, Justin Roebuck, stating that the Board of Commissioners scheduled a special meeting on February 22, 2024 to "*consider a response to the letter from the County Administrator John Gibbs*."  *See* **Exhibit 4**, February 21, 2024 Notice.

133.   Hence, the February 22, 2024 special meeting was precipitated by Plaintiff's July 18, 2023 Deficiency Letter, as well as both the January 15 and February 15, 2024 letters from his attorneys warning Defendants against violations of law.

134.   During the closed meeting on February 22, 2024, the Board verbally informed Plaintiff of "complaints" concerning his performance by reading off a sheet of paper that was not offered to Plaintiff.  None of the "complaints" had been raised with Plaintiff prior to the February 22, 2024 meeting.

33

135.   None of the complaints raised at the February 22, 2024 meeting had been previously reported to the County's Human Resources Department, and at no point prior to the meeting was Plaintiff told the complaints.

136.   During the February 22, 2024 meeting, the Board voted to place Plaintiff on administrative leave.

137.   Plaintiff was placed on administrative leave as a result of sending the July 18, 2023 Deficiency Letter, protesting a proposed $4M settlement in the *Hambley* matter, and for the two letters sent by Plaintiff's pre-litigation and litigation counsel outlining Plaintiff's belief that Defendants were violating the law.

**Defendant Moss Defamed Plaintiff**

138.   On February 23, 2024, Defendant Moss sent a letter to Plaintiff detailing the complaints regarding his performance (the "Complaint Letter").

139.   The Complaint Letter states the following:

a.   A commissioner has reported that he believes [Plaintiff] was not truthful in his testimony in the Hambley hearing. [Plaintiff] repeatedly stated he did not remember information when questioned.

b.   I witnessed [Plaintiff] threaten to physically harm Attorney Jack Jordan to [Defendant Moss] immediately after an Ottawa County Insurance Authority Meeting.

c.   I witnessed [Plaintiff] make extremely disparaging comments about the female Commissioners, most notably sexual/defamatory comments about Commissioner Gretchen Cosby on multiple occasions.

d.   [Plaintiff] had me assist him in bugging his office with a hidden camera fixed on his meeting table to record conversations with Commissioners and County Employees.

e.   [Plaintiff] routinely made derogatory comments about the majority of County Commissioners and Corporation Counsel, claiming their Protestant faith severely impacted their IQ and work ethic.

> f.    [Plaintiff] routinely subjected me to what I would consider a degrading and hostile work environment. He would routinely hand out meaningless tasks, many of which had little to do with county operations day, night, weekends, and holidays. This around the clock work style and abusive environment was detrimental to my mental health and personal life.
>
> g.    At a meeting on February 12, 2024[,] entitled "Performance Improvement Conversation", [Plaintiff] insinuated that I needed to be loyal to him and not the Board of Commissioners. [Plaintiff] made a comment during the meeting which he insinuated terminating my employment if I didn't fight for him.

140.   The Complaint Letter attributes the following defamatory statements to an anonymous "different county employee":

> a.    [Plaintiff] has refused to solicit necessary information from other departments, such as potential ongoing financial fraud. [Plaintiff] has refused to make a plan for handling critical union negotiations and insists on doing it himself, even though he is not skilled in this area… [Plaintiff] refuses to provide oversight and direction to these department heads.
>
> b.    [Plaintiff] has expressed on multiple occasions that he wants to "beat Jack Jordan to death" for perceived slights and offenses.
>
> c.    [Plaintiff] maintains a very confrontational and adversarial relationship with all of the Commissioners except [Defendant Moss]. He expresses that he does not need or value their input.
>
> d.    [Plaintiff] tasked the Deputy Administrator and Senior Executive Aide with obtaining security services for a 'bug sweep' and review of his materials. [Plaintiff] wanted this done monthly. The resulting paranoia, anxiety, and fear created a hostile workplace because there was a perception that bugs and listening devices were installed in the offices.
>
> e.    [Plaintiff] was having zero contact or communication with the legal team on policy proposals, and they were consequently not having any communications with him. This breakdown in communications is causing ongoing problems and failures for important County initiatives.
>
> f.    [Plaintiff] has repeated on several occasions, a bizarre theory about Commissioner Gretchen Cosby being 'out of God's grace' because of a perceived pattern of infidelity, specifically accusing her of

cheating on her husband with doctors and patients. He said his perception that there were problems in her marriage, because she wasn't always wearing a wedding ring, was likely due to infidelity on her part…He said it was common knowledge that nurses were unfaithful in their marriages. This seemed to be solely motivated by her reasoned and patient opposition to him. Even though I don't believe Commissioner Cosby is evangelical, he refers to her and other[s] as retard evangelicals.

    g.    [Plaintiff] regularly and repeatedly overrules and contradicts decisions made by the Commissioners.

    h.    [Plaintiff] was often planning to terminate employees without cause and without documentation. The proper process to document cause, initiate an HR-led hearing and investigation, and then terminate if the issues could not be resolved, was never followed.

141.    The Complaint Letter attributes the following defamatory statement to an anonymous "Ottawa County Board Commissioner":

    a.    [Plaintiff] drafted a Security Reimbursement Policy and I was not in support of it and gave him my reasons why I wasn't in support (Commissioner Roger Belknap and Commissioner Gretchen Cosby were with me when I shared with John my reasons). During [Plaintiff]'s initial visit the end of December with newly elected commissioner, Kendra Wenzel, John decided to share with Kendra that I wasn't in support of the resolution and told her that he believed it was because I was a woman (which is completely false and baseless).

142.    The Complaint Letter goes on to make the following defamatory statements:

    a.    It was reported that employees talked about physically harming [Defendant Moss] on November 28, 2023 . . . [Defendant Moss] followed up with [Plaintiff] about the complaint multiple times . . . [Plaintiff] did not seem to take this situation seriously. He later told [Defendant Moss] that the person who reported the incident was mentally unstable. The delays in the process and the apathy displayed by the [Plaintiff] caused concern. To [Defendant Moss's] knowledge, no disciplinary or corrective action was taken in this situation . . . The statement made by [Plaintiff] that the person who reported the threats was "mentally unstable" was dishonest.

    b.    In the December Insurance Authority meeting, [Defendant Moss] witnessed [Plaintiff] become needlessly aggressive with Attorney Jack Jordan. He raised his voice at him during the meeting in an

unprofessional manner over the entire room. It was very strange and Jack responded quietly and professionally. This pattern became apparent in the November/December timeframe. For example, Commissioners Rhodea and Miedema informed [Defendant Moss] they had seen a similar outburst from [Plaintiff] during a Road Commission meeting. They were concerned with [Plaintiff] treating other people in the county in that same manner, with unwarranted aggression. This behavior contributed to board members losing trust in [Plaintiff].

c.      In early December of 2022, the chairs of the board subcommittees increasingly shared concerns about interactions with [Plaintiff], and questioned whether he had begun subverting their efforts regarding forwarding and/or holding back agenda items.

d.      Subcommittee chairs were concerned with [Plaintiff's] desire to increase [Plaintiff's] control within county policies related to personnel issues.

e.      [Two employees] appeared to be outwardly disturbed by sexual statements which had been made about Commissioner Cosby [by Plaintiff], wanting to protect her from being hurt by hearing the statements. It was clear being subjected to listening to [Plaintiff's] sexual statements about Gretchen had put them in a difficult situation.

f.      The two employees also shared [Plaintiff's] ongoing shut-out of communications with corporate counsel and lack of willingness to work with them for the betterment of the county. They additionally shared an outburst following an insurance authority meeting where [Plaintiff] threatened bodily harm to Jack Jordan.

143.    Collectively, the above statements within the Complaint Letter are the "Defamatory Statements."

144.    The Defamatory Statements are false and have no basis in fact.

145.    On February 23, 2024, Defendant Moss published the Complaint Letter to his public Facebook page, attaching to a Facebook post a freely accessible copy of the Complaint Letter (the "Facebook Post").



146.    The Facebook Post published the Complaint Letter and all of the Defamatory Statements therein to the public.

147.    As a result of Defendant Moss's publication of the Complaint Letter, the Complaint Letter and the Defamatory Statements therein were published in several newspapers, including, *inter alia*:

a.    An article published on February 23, 2024, entitled "Letter alleges Ottawa County Administrator threatened violence, bugged office", published by Fox 17.  This article quotes from and allows access to the Complaint Letter.

b.    An article published on February 23, 2024, entitled "Threats, incompetence: Allegations fly between Ottawa County and John Gibbs", published by the Holland Sentinal.  This article quotes from the Complaint Letter.

c.    An article published on February 23, 2024, entitled "Ottawa County Board Chair complaints against John Gibbs", published by WZZM13.  This article quotes from and allows access to the Complaint Letter.

148.    As a result of Defendant Moss' publication of the Complaint Letter, the Defamatory Statements have been widely publicized.

38

149.   Defendant Moss knew that the Defamatory Statements were false and/or reckless to allege.

150.   This is clear because the complaints and allegations contained within the Defamatory Statements, including allegations that Plaintiff engaged in criminal conduct, allegedly occurred months earlier, but they were not published by Defendants until after Plaintiff engaged in protected whistleblower activity.

151.   If the complaints and allegations contained within the Defamatory Statements were true, or if Defendant Moss reasonably believed them to be true, Defendant Moss or the Board would have raised them with Plaintiff prior to Plaintiff engaging in protected whistleblower activity.

152.   Defendant Moss' act of posting the Defamatory Statements to his Facebook page falls outside the scope of powers of the Ottawa County Board of Commissioners authorized by MCL § 46.11.

153.   On or about February 27, 2024, Plaintiff responded to the Complaint Letter, addressing each of the Defamatory Statements line-by-line in order to demonstrate to Defendant Moss falsified the Defamatory Statements.

154.   Upon information and belief, Defendant Moss did not share Plaintiff's response to the Defamatory Statements to the Board.

155.   On February 29, 2024, the Board terminated Plaintiff for cause, citing the Defamatory Statements recited in the Complaint Letter.

156.   But for Plaintiff's protected activities described above, Plaintiff would not have been terminated.

**COUNT I**
**42 USC § 1983**
**FIRST AMENDMENT RETALIATION**
**(Against Ottawa County)**

157.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

158.    The First Amendment of the United States Constitution, as incorporated into the 14th Amendment, prevents governments from abridging an individual's freedom of speech.

159.    The freedom of speech is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415, 99 S. Ct. 693, 697, 58 L. Ed. 2d 619 (1979).

160.    The First Amendment protects an individual from retaliation when he has exercised his freedom of speech.

161.    The rationale for protecting a public employee's right to comment on matters of public concern is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).

162.    An employee speaking as a citizen is speaking on a matter of public concern when that speech can be fairly considered as relating to any matter of political, social, or other concern to the community.  Another consideration is whether the speech involves a subject of general interest and of value and concern to the public.  *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012).

40

163.   Speech entails a matter of public concern when the speech involves issues for which information is needed to enable members of society to make informed decisions regarding their government's operation. *Banks v. Wolfe Co. Bd. of Ed.*, 330 F.3d 888, 892 (6th Cir. 2003).

164.   "Public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Id.* at 83-84.

165.   "When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation*." Garvin v. Detroit Bd. of Educ.*, No. 298838, 2013 WL 951118, at *11 (Mich. Ct. App. Feb. 26, 2013), citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

166.   Plaintiff's speech addressing the performance of the Corporation Counsel, through the March 10 Email and the Deficiency Letter, was not made pursuant to his duties as County Administrator.

167.   Where an employee's complaint constitutes an extraordinary, rather than everyday communication, that complaint will fall outside the scope of the employee's duties and therefore within the scope of the First Amendment protections. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 768 (6th Cir. 2010).

168.   Here, the Deficiency Letter is plainly not an everyday communication, but rather constitutes an extraordinary communication necessitated by extraordinary circumstances. Indeed, Plaintiff writes in the Deficiency Letter that ". . . after much deliberation, [he was] duty-bound to inform you of a significant issue which hinders [his] ability to carry out the responsibility you have entrusted to [him]."

41

169.    The Deficiency Letter was therefore an extraordinary communication necessitated by extraordinary circumstances, vis-à-vis, the Corporation Counsel's continued deficient performance.

170.    Accordingly, the Deficiency Letter falls outside the scope of Plaintiff's employment and his speech pursuant to which was undertaken as a private citizen.

171.    "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).

172.    Plaintiff's speech was made as a citizen on a matter of public concern.

173.    Bringing to light potential or actual wrongdoings or a breach of the public trust are generally matters of public concern. *Connick v. Myers*, 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L. Ed. 2d 708 (1983). Moreover, "discipline and morale in the workplace are related to an agency's efficient performance of its duties[.]" *Id.*

174.    The continued deficient performance of the County's Corporation Counsel, and the expenditure of significant public funds, is a matter of public concern.

175.    Defendant punished Plaintiff for raising matters of public concern, including, *inter alia*, placing Plaintiff on administrative leave and terminating him.

176.    Plaintiff's termination was motivated, at least in part, by the exercise of his First Amendment Right to free speech.

177.    Plaintiff's interest as a citizen in speaking on these matters was significant, as they concerned substantial matters of ethics and public safety that she was well informed and entitled to make.

178. Plaintiff's speech had no impact on the efficiency of the County, and therefore Defendants had no interest in curtailing this speech to promote the efficiency of the public services they performed through their employees.

179. Defendants acted with deliberate indifference to Plaintiff's presumed and actual innocence.

180. Defendants agreed to, approved, and ratified this unconstitutional conduct.

181. It would have been plainly obvious to a reasonable official that such actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

182. Defendants' actions and inaction, as set forth above, were fundamentally unfair to Plaintiff.

183. As a direct and proximate results of Defendants' retaliation, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation, and embarrassment and the physical effects associated therewith, and will so suffer in the future.

184. As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work in the future.

**COUNT II**
**MCL § 15.361, *et seq*.**
**RETALIATION IN VIOLATION OF**
**MICHIGAN'S WHISTLEBLOWER PROTECTION ACT**
**(Against Ottawa County)**

185.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

186.    At all relevant times, Defendant was an employer and Plaintiff was an employee covered by and within the meaning of the WPA, MCL § 15.361, *et seq*.

187.    Defendant is a public body within the meaning of the WPA, MCL § 15.361, *et seq*.

188.    MCL § 15.362 protects an employee who "reports or is about to report, verbally or in writing, a violation or a suspected violation of law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body[.]"

189.    Plaintiff engaged in protected activity under MCL § 15.362 when he reported both directly and through his counsel to the Board, a public body, various suspected violations of the law.

190.    Plaintiff also engaged in protected activity under MCL § 15.362 because he, through his attorneys, sent a communication to the County stating that he had sought legal representation in connection with his disciplinary actions.

191.    Defendants retaliated against Plaintiff because of his protected activity in violation of the WPA by, *inter alia*, placing him on administrative leave and terminating his employment.

192.    As a direct and proximate cause of Defendants' violation of the WPA, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

193.     As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work in the future.

### COUNT III
### M.C.L. § 600.2911, *et seq.*
### <u>VIOLATION OF MICHIGAN DEFAMATION LAW</u>
### <u>(Against Defendant Moss)</u>

194.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

195.     To prevail on a claim for defamation, a plaintiff must establish by a preponderance of the evidence: (1) that the defendant made a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Rouch v. Enquirer & News of Battle Creek* 440 Mich. 238, 251 (1992); *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 589 (1984).

196.     Where the plaintiff in a defamation claim is a public figure, they must prove that the statement was false and that it was made with the requisite level of culpability.  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).  The requisite level of culpability for a plaintiff who is a public figure must prove is that the false statements were made with "actual malice". *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

197.     "Actual malice" does not require a showing of ill will, but "exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth."  *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 114 (2010).

198.    This requirement is codified by M.C.L. 600.2911(6), which provides: "An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false."

199.    Whether the statements are defamatory and whether the evidence presented is sufficient to show actual malice on the part of the defendant present questions of law to be decided by the courts. *Smith*, 487 Mich. At 111.

200.    By reason of his public role and political candidacy, Plaintiff in the present case is a public figure.

201.    Plaintiff asserts that the subjects of his claim for defamation are the Defamatory Statements contained within the Complaint Letter.

202.    Each of these statements are false and defamatory because they, individually and when considered together, harm Plaintiff's reputation to the extent that his reputation within the community has been lowered and others may be deterred from associating with him. *Lawrence v. Burdi*, 314 Mich. App. 2023, 214.

203.    By making the Facebook Post on February 23, 2024, and attaching the Complaint Letter thereto, Defendant Moss published the Defamatory Statements within the Complaint Letter to an indeterminate number of public individuals.

204.    In doing so, Defendant Moss carried out an unprivileged communication with at least tens of thousands of people.

205.    Defendant Moss published the Defamatory Statements outside the scope of his duties as Chairman of the board of commissioners, as the Defamatory Statements have nothing to do with the powers enumerated in MCL § 46.11.

206.    It is true that courts outside of Michigan have held that Internet message boards and similar communications platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact.  *Summit Bank v. Rogers*, 206 Cal. App 4th 669, 696-698 (2012).  However, even if this court were to adopt this presumption, it must be defeated here because Defendant Moss implied the truth of the statements within the Complaint Letter by stating in the Facebook Post that:

> Transparency and accountability are hallmarks of representational government in America, a Constitutional Republic.  I am sharing this letter with you in that spirit.  The board will meet again next week to consider this matter.  I will share more information as I am able.

207.    By stating that he intended to publish the Complaint Letter in the spirit of transparency and accountability, and by stating that the Board planned to discuss the contents of the letter in a formal meeting, Defendant Moss implied that the defamatory statements contained within the Complaint Letter were true and worthy of public consideration.

208.    Furthermore, and in the alternative, because the defamatory statements were contained within the Complaint Letter rather than Defendant's Facebook Post, the defamatory statements were not made on an Internet message board, they should not be presumed to be statements of Defendant Moss's opinion.

209.    A number of the Defamatory Statements constitute accusations by Defendant Moss that Plaintiff had engaged in criminal activity.  Specifically, (a) the various defamatory statements that Plaintiff threatened to beat Jack Jordan to death constitutes an accusation that Plaintiff had

committed the crime of assault against Jack Jordan; and (b) the defamatory statement that Plaintiff intentionally lied during the "Hambley hearing" constitutes an accusation that Plaintiff had committed the crime of perjury.

210. Statements imputing the commission of a crime constitute defamation *per se*. M.C.L. § 600.2911(1); *Hope-Jackson v. Washington*, 311 Mich. App/ 602, 620-621 (2015).

211. In relation to the statements imputing the commission of battery and perjury to Plaintiff, Defendant Moss's publication of those statements constitutes defamation *per se*.

212. Because of Defendant Moss' conduct, Plaintiff has suffered significant damage to his reputation.

213. The Complaint Letter and the Defamatory Statements have been cited in a litany of news publications including those described in this Complaint.

214. Defendant Moss knew or should have known that the Defamatory Statements within the Complaint Letter were false.

215. By publishing the Defamatory Statements within the Complaint Letter and through the Facebook Post, Defendant Moss knowingly made false statements or made false statements with a reckless disregard for the truth.

216. As a direct and proximate result of Defendant Moss's defamatory conduct, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith, and will so suffer in the future.

217. As a further direct and proximate result of Defendant Moss's defamatory conduct, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and

a loss of and impairment of his earning capacity and ability to work and will so suffer in the future, and he will suffer additional damages in the future.

WHEREFORE, Plaintiff John Gibbs requests the following relief from this Honorable Court against Defendants:

a. Declare that the aforementioned practices and actions of Defendants constitutes an unlawful violation of 42 U.S.C. § 1983;

b. Declare that the aforementioned practices and actions of Defendants constitute an unlawful violation of Michigan's Whistleblower Protection Act, MCL 15.362, *et seq*.

c. Declare that the aforementioned practices and actions of Defendant Moss constitute defamation contrary to MCL 600.2911, *et seq*.

d. Award Plaintiff compensatory, economic, and noneconomic damages in whatever amount Plaintiff is found to be entitled, including all lost wages and benefits, past and future, in whatever amount he is found to be entitled;

e. Award Plaintiff compensatory damages for monetary and nonmonetary loss in whatever amount he is found to be entitled;

f. Award Plaintiff exemplary and punitive damages in whatever amount he is found to be entitled;

g. Award Plaintiff appropriate equitable relief;

h. Declaratory Relief;

i. Award Plaintiff reasonable attorney's fees, costs, and interests; and

j. Award such other relief as this Court deems just and proper.

Respectfully Submitted,

HURWITZ LAW PLLC

/s/ *Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
*Attorney for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, Michigan 48104
noah@hurwitzlaw.com

Dated: June 24, 2024

49

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN GIBBS,

     Plaintiff,                         Case No. 1:24-cv-357-JMB-RSK

v.                               Hon. Jane M. Beckering

OTTAWA COUNTY, and JOE MOSS,
individually,

     Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Michael S. Bogren (P34835) |
| HURWITZ LAW PLLC | PLUNKETT COONEY |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |
| 340 Beakes St. STE 125 | 333 Bridge St. NW STE 530 |
| Ann Arbor, MI 48104 | Grand Rapids, MI 49504 |
| (844) 487-9489 | (269) 226-8822 |
| noah@hurwitzlaw.com | mbogren@plunkettcooney.com |

## DEMAND FOR TRIAL BY JURY

     Plaintiff John Gibbs, by and through his attorneys, HURWITZ LAW PLLC, hereby

demands a trial by jury of the issues in the above-captioned cause of action.

                             /s/ *Noah S. Hurwitz*
                             Noah S. Hurwitz (P74063)
                             HURWITZ LAW PLLC
                             *Attorney for Plaintiff*
                             340 Beakes St., Ste. 125
                             Ann Arbor, Michigan 48104
Dated: June 24, 2024           noah@hurwitzlaw.com