## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN GIBBS,

      Plaintiff,                          Case No. 1:24-cv-357-JMB-RSK

v.                                        Hon. Jane M. Beckering

OTTAWA COUNTY, and
JOE MOSS, individually,

      Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Michael S. Bogren (P34835) |
| Grant M. Vlahopoulos (P85633) | *Attorney for Defendants* |
| HURWITZ LAW PLLC | PLUNKETT COONEY |
| *Attorneys for Plaintiff* | 333 Bridge St. NW, STE 530 |
| 340 Beakes St. STE 125 | Grand Rapids, Michigan 49504 |
| Ann Arbor, Michigan 48104 | (269) 226-8822 |
| (844) 487-9489 | mbogren@plunkettcooney.com |
| noah@hurwitzlaw.com | |
| grant@hurwitzlaw.com | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

      NOW COMES Plaintiff John Gibbs ("Plaintiff"), by and through his attorneys, HURWITZ

LAW PLLC, and respectfully requests that the Court enter an Order denying Defendants' Motion

to Dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  In support

of his Response, Plaintiff relies on the facts and law in the accompanying Brief in Support of

Plaintiff's Response to Defendants' Motion to Dismiss.

                                   Respectfully submitted,

                                   HURWITZ LAW PLLC

                                   */s/ Noah S. Hurwitz*
                                   Noah S. Hurwitz (P74063)
                                   Grant M. Vlahopoulos (P85633)

*Attorneys for Plaintiff*
340 Beakes St., STE. 125
Ann Arbor, Michigan 48104
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: August 5, 2024

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN GIBBS,

      Plaintiff,                           Case No. 1:24-cv-357-JMB-RSK

v.                                        Hon. Jane M. Beckering

OTTAWA COUNTY, and
JOE MOSS, individually,

      Defendants.

---

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Michael S. Bogren (P34835) |
| Grant M. Vlahopoulos (P85633) | *Attorney for Defendants* |
| HURWITZ LAW PLLC | PLUNKETT COONEY |
| *Attorneys for Plaintiff* | 333 Bridge St. NW, STE 530 |
| 340 Beakes St. STE 125 | Grand Rapids, Michigan 49504 |
| Ann Arbor, Michigan 48104 | (269) 226-8822 |
| (844) 487-9489 | mbogren@plunkettcooney.com |
| noah@hurwitzlaw.com | |
| grant@hurwitzlaw.com | |

---

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... ii

**STATEMENT OF ISSUES PRESENTED** ............................................................ iv

**INTRODUCTION** .................................................................................................. 1

**STATEMENT OF FACTS** .................................................................................... 2

**STANDARD OF REVIEW** .................................................................................. 14

**ARGUMENT** ........................................................................................................ 15

    I.     PLAINTIFF'S AMENDED COMPLAINT SUFFICIENTLY PLEADS A *PRIMA FACIE* CASE OF FIRST AMENDMENT RETALIATION. ........... 15

          A.     Plaintiff Engaged in Constitutionally Protected Conduct by Speaking as a Private Citizen. ................................................................. 16

    II.    PLAINTIFF'S AMENDED COMPLAINT SUFFICIENTLY PLEADS A *PRIMA FACIE* CASE OF MICHIGAN'S WHISTLEBLOWER PROTECTION ACT. ................................................................................ 26

    III.   DEFENDANT MOSS ACTED OUTSIDE THE SCOPE OF HIS LEGISLATIVE AUTHORITY BY POSTING TO HIS FACEBOOK PAGE DEFAMATORY CONTENT REGARDING PLAINTIFF AND RECEIVES NO IMMUNITY. ............................................................................................ 29

**CONCLUSION** .................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*American Transmissions, Inc. v. Attorney General*, 454 Mich. 135 (1997) ................................. 31

*Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021)......................................................... 2, 29, 30, 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 15

*Bogan v. Scott-Harris*, 523 U.S. 44 (1998)................................................................. 2, 29, 30

*Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477 (M.D. Tenn. 2019) ....................... 17

*Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015)................................................................ 16

*Brown v. Mayor of Detroit*, 271 Mich. App. 692 (2006) ...................................................... 31

*Canary v. Osborn*, 211 F.3d 324 (6th Cir. 2000)................................................................... 30

*Chandler v. Dowell Schlumberger Inc.,* 456 Mich 395 (1998) .............................................. 26

*Chupa v. Moceri*, No. 288338, 2010 WL 746243 (Mich. Ct. App. Mar. 4, 2010) ..................... 31

*Colorez v. City of Cincinnati*, 441 F. Supp. 3d 560 (S.D. Ohio 2020) ..................................... 17

*Dolan v. Cont'l Airlines/Cont'l Exp.*, 454 Mich. 378 (1997) ................................................ 26

*Fox v. Traverse City Area Pub. Sch. Bd. of Educ.,* 605 F.3d 345 (6th Cir. 2010)...................... 25

*Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010) ........................................... 15

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................. 16, 17, 18, 22

*Garvin v. Detroit Bd. of Educ.*, 2013 WL 951118 (Mich. Ct. App. Feb. 26, 2013) .................... 17

*Haddad v. Gregg*, 910 F.3d 237 (6th Cir. 2018)................................................................... 15

*Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531 (6th Cir. 2012)............................... 15, 24

*Kimmelman v. Heather Dawns Mgt. Ltd.*, 278 Mich.App. 569 (2008) ................................. 1, 27

*Ladach v. City of Romulus*, 2018 WL 5077181 (E.D. Mich. Aug. 24, 2018) ............................ 24

*Lane v. Franks*, 573 U.S. 228 (2014)........................................................... 1, 16, 17, 22

*Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456 (6th Cir. 2017) ............................... 18, 25

*Morris & Doherty, P.C. v. Lockwood*, 259 Mich.App. 38 (2003) .......................................... 28

*O'Neal v. 52nd Dist. Ct.*, No. 22-10470, 2022 WL 19976193 (E.D. Mich. Nov. 4, 2022) ......... 25

*Pace v. Edel-Harrelson*, 499 Mich. 1 (2016)................................................................... 26

*Pickreing v. Bd. of Educ.*, 391 U.S. 563 (1968)........................................................... 16, 22

*Pucci v. Nineteenth District Court*, 628 F.3d 752 (6th Cir. 2010)....................................... 24, 25

*Rateree v. Rockett*, 852 F.2d 946 (7th Cir. 1988) ................................................................ 31

*Romero v. City of Middletown*, 479 F. Supp. 3d 660 (S.D. Ohio 2020)................................... 24

*Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503 (6th Cir. 2020)................................. 15

*San Diego v. Roe*, 543 U.S. 77 (2004)................................................................................ 23

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007) ............................................ 18

## Statutes

MCL 15.361(d)(iv) ........................................................................................................ 27

MCL 15.362........................................................................................................... 26

MCL 600.901 .......................................................................................................... 28

MCL 600.916(1) ...................................................................................................... 28

MCL 691.1407(5) .................................................................................................... 29

## Rules

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 15, 26

Fed. R. Civ. P. 8(a)(2)......................................................................................................... 15

## STATEMENT OF ISSUES PRESENTED

I.    Whether Plaintiff's Count I (First Amendment Retaliation) should be dismissed where Plaintiff spoke as a private citizen, and it is undisputed that Plaintiff's speech was a matter of public concern and there is plausibly a causal connection between Plaintiff's termination and his speech.

Plaintiff's Answer: "No"
Defendants' Answer: "Yes"
This Court Should Answer: "No"

II.   Whether Plaintiff's Count II (Violation of Michigan's Whistleblower Protection Act) should be dismissed where Plaintiff engaged in protected activity by reporting to his legal counsel suspected violations of law rooted in Defendants' retaliatory efforts and there is no dispute that a causal connection exists between the protected activity and Plaintiff's termination.

Plaintiff's Answer: "No"
Defendants' Answer: "Yes"
This Court Should Answer: "No"

III.  Whether Count III (Violation of Michigan's Defamation Law) against Defendant Moss should be dismissed where Defendant Moss does not even dispute that he defamed Plaintiff and Defendant Moss is not entitled to governmental immunity because posting defamatory content to his Facebook regarding Plaintiff is not integral to the legislative process and the status of Plaintiff's employment contract is not a discretionary, policy making decision.

Plaintiff's Answer: "No"
Defendants' Answer: "Yes"
This Could Should Answer: "No"

## **INTRODUCTION**

Plaintiff John Gibbs, former County Administrator for the County of Ottawa, was retaliated against by Defendant Ottawa County Board of Commissioners after engaging in speech protected by the First Amendment of the United States Constitution (Count I).  Defendant Ottawa County mostly concedes that it retaliated against Plaintiff, but erroneously attempts to immunize itself from liability by arguing that Plaintiff engaged only in unprotected employee-speech.  Defendant Ottawa County glosses over the Supreme Court's holding in *Lane v. Franks* held that "speech made by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." 573 U.S. 228, 240 (2014).  Plaintiff's ordinary job duties did not include the subject matter of his protected speech.  Moreover, the County Administrator position lacks authority to investigate or discipline Corporation Counsel, officers to the Board of Commissioners.  .

Defendant Ottawa County also seeks to dismiss Plaintiff's Counts II (violation of Michigan's Whistleblower Protection Act, MCL § 15.362, *et seq*.) and III (defamation by Chairman of the Ottawa County Board of Commissioners Joe Moss).  With respect to Count II, Defendant Ottawa County argues that Plaintiff did not engage in protected activity.  However, Plaintiff reported to judicial officers that he suspected Defendant Ottawa County was unlawfully retaliating against him and "[t]here is absolutely nothing, express or implied, in the plain wording of the [WPA] that limits its applicability to violations of law by the employer or to investigations involving the employer."  *Kimmelman v. Heather Dawns Mgt. Ltd*., 278 Mich.App. 569, 575 (2008).

Further, it is undisputed that Defendant Moss maliciously posted to his public Facebook profile a "Complaint Letter" containing a litany of provably false and defamatory statements about

Plaintiff in violation of Michigan defamation law, MCL § 600.2911, *et seq*. (Count III).  Defendant

Moss does not dispute that he defamed Plaintiff, but instead asks for absolute governmental

immunity pursuant to MCL 691.1407(5).  Defendant Moss, however, lacks immunity for his

actions because the hiring or firing of a particular employee is not a legislative act.  *Bogan v. Scott-*

*Harris*, 523 U.S. 44, 55-56 (1998).  Indeed, when Defendant Moss made defamatory social media

posts about Plaintiff it (a) was not an integral step in the legislative process; and (b) did not include

a discretionary, policy making decision impacting Ottawa County's budgetary priorities and its

services to its constituents.  *Anders v. Cuevas*, 984 F.3d 1166, 1181-82 (6th Cir. 2021).

Accordingly, absolute governmental immunity will not bar Plaintiff's defamation claim.

## STATEMENT OF FACTS

### Plaintiff's Employment as Ottawa County Administrator

On January 3, 2023, Plaintiff and the Ottawa County Board of Commissioners (the

"Board") entered into an Employment Agreement pursuant to MCL § 46.11(o) to employ Plaintiff

as the Ottawa County Administrator.  (ECF No. 12, PageID.98-99, ¶¶9-10); (*See also* ECF No.

12-1, Employment Agreement).  Under the terms of the Employment Agreement, Plaintiff's was

to serve as Ottawa County Administrator for a period of three years—from January 3, 2023 through

January 2, 2026.  (ECF No. 12, PageID.100, ¶14).  The statutory language of MCL § 46.11(o) does

not set forth the job responsibilities and duties of a county administrator.  (*Id*. ¶12).  Instead,

Exhibit A of the Employment Agreement, entitled "Responsibilities and Duties," states that

Plaintiff shall:

1.  Be responsible for the day-to-day administration of the County of Ottawa, Michigan.

2.  Supervise the operations and performance of all County department and department heads, **except elected officials and their officers**, and, with the

approval of the Board, appoint and remove all heads of departments, other than elected officials.

3.  Coordinate the various activities of the County and unify management of its affairs.

4.  Attend and/or have department heads attend all regularly scheduled Board meetings and, at the direction of the Board, special Board meetings.

5.  Supervise the preparations of filing, or submission, of all reports required of the County by law.

6.  Be responsible for the future direction of the County be developing a continuing strategic plan of the County and presenting it to the Board for approval.

7.  Be responsible for the following discal services for the County of Ottawa: Accounting, Accounts Payable, Budgeting, Payroll and Receivables, except to the extent that portions of those responsibilities are assigned, by statute, to other offices or entities.

8.  Perform such other duties as the Board may assign.

(ECF No. 12-1, PageID.153).  Plaintiff excelled in his role as Ottawa County Administrator and at no point during Plaintiff's employment with Ottawa County was he subjected to any disciplinary action or complaints that he was made aware of.  (ECF No. 12, PageID.100-01, ¶¶17-19).

### The Employment of Ottawa County Corporation Counsel

Pursuant to MCL § 168.200 and MCL § 49.153, all prosecuting attorneys that serve a county in the State of Michigan, including Ottawa County, are elected officials entrusted by citizens and shall "prosecute or defend in all courts of the county, all prosecutions, suits, applications and motions whether civil or criminal, in which the state or county may be a party or interested."  (*Id*. at PageID.101-102, ¶¶20-22).  However, under MCL § 49.71, "[t]he board of [commissioners] of any county by a majority vote of the member-select may employ an attorney to represent the county in *civil matters*, whenever the board determines that the prosecuting

3

attorney in unable to properly represent the county.  ***Such attorney shall receive such compensation as shall be determined by the board of [commissioners]***."  (*Id*. at ¶22).

On September 12, 2000 (over two decades prior to Plaintiff's employment and the election of any current Board members), the Board executed a Resolution to "***create*** the office of Ottawa County Corporation Counsel" and "transfer the general civil counsel functions for Ottawa County from the Ottawa County Prosecutor's Office to the Office of Ottawa County Corporation Counsel[.]"  (*Id*. at ¶¶23-25); (*see also* ECF No. 12-2).  The Board, through the September 2000 Resolution, seemingly attempted to "create" a new department entitled, "Office of Corporation Counsel."  (*Id*. at ¶27).  Critically, however, the statutory powers afforded to the Board are enumerated in MCL § 46.11, which does not authorize the power to "create" the Office / Department of Corporation Counsel.  (ECF No. 12, PageID.103-05, ¶¶26-33).  Likewise, MCL § 46.11 does not authorize the Board to consolidate departments, create additional departments, and/or require a county administrator to serve as a director of a department.  (*Id*. ¶32).  Upon the transfer of powers vested in the elected prosecuting attorney of Ottawa County to handle civil counsel functions, the attorneys employed as corporation counsel serve in the capacity of *officers* to elected officials (*i.e.*, the Board of Commissioners).  (*Id*. at ¶¶34-35); *see also* MCL § 49.153.

Ottawa County Resolution 95-38—the Resolution adopted on January 3, 2023, to hire Plaintiff as County Administrator—supersedes and repeals the September 12, 2000 Resolution because they are in conflict.  (*Id*. ¶35).  Resolution 95-38 provides that "all resolutions and parts of resolutions insofar as they conflict with this Resolution [95-38] are hereby repealed."  (*Id*.)  The September 2000 Resolution conflicts with Plaintiff's Employment Agreement because he is not permitted to "supervise the operations" of "elected officials ***and their officers***."  (*Id*.)  Thus, Plaintiff, as County Administrator, lacks authority to supervise the operations of corporation

counsel.  (*Id*.)  Further, Plaintiff's responsibilities and job duties described in Exhibit A of the Employment Agreement are facially void of any reference to (a) *hiring or firing* Ottawa County's corporation counsel; and (b) determining or recommending the *compensation* provided to Ottawa County's corporation counsel.  (*Id*. at PageID.106, ¶¶36-37)  Plaintiff's Employment Agreement does not reference or explicitly state that the September 12, 2000 is incorporated into Plaintiff's responsibilities and duties.  (*Id*. at ¶38).

On January 3, 2023, the first day of Plaintiff's employment, the Board adopted a Resolution stating, in pertinent part:

> NOW THEREFORE BE IT RESOLVED, the [Board] appoints Kallman Legal Group, PLLC ("Kallman Legal Group") as interim corporate counsel **to the Board of Commissioners**; and
>
> BE IT FURTHER RESOLVED, that Kallman Legal Group will present a proposed contract for legal services to the [Board] within seven (7) days; and
>
> BE IT FURTHER RESOLVED, that Kallman Legal Group will be paid their standard hourly billing rate for services rendered until such time as a contract is finalized[.]

(*Id*. at PageID.107, ¶43); (ECF No. 12-3).  The January 3, 2023 Resolution does not say that Kallman Legal Group is supervised or directed by Plaintiff.  (*Id*. at ¶44).  Thereafter, on January 10, 2023, the Board narrowly approved a 6-5 vote to employ Kallman Legal Group, a law firm headquartered in Lansing, Michigan and operated by attorney David Kallman (hereafter referred to as "Corporation Counsel").  (*Id*. at PageID.108, ¶45).  Plaintiff was not asked by the Board to recommend compensation and benefits for the employment of Kallman Legal Group, nor was Plaintiff involved in the negotiation or presentation of Kallman Legal Group's contract with Ottawa County.  (*Id*. at ¶¶46-47).

The Board's selection of Corporation Counsel was viewed by the public as highly concerning because there was (a) no open bidding procedure to screen other law firms; and (b)

Ottawa County residents commented on a perceived conflict-of-interest between Defendant Moss and Corporation Counsel.  (*Id*. at PageID.108-11, ¶¶48-52).  For example, on January 9, 2023, the Holland Sentinel reported that "the board didn't open up the bidding/application process to other firms to compete.  And, perhaps more problematic, the two primary attorneys of Kallman Legal Group – David A. Kallman and Stephen P. Kallman – are related to board chair Joe Moss' business partner, Koel Kallman."  (*Id*. at ¶49).  On January 10, 2023, Bridge Michigan reported that "[t]he vote came amid conflict of interest claims and transparency concerns from other commissioners and the public.  The hire was approved without competitive bidding process – one required by the county's purchasing policy – and despite concerns that state records indicate commission chair Joe Moss is a business partner with the brother of two Kallman Attorneys . . . Some commissioners *and residents* also questioned whether Moss should have recused himself from voting for Kallman's hiring due to a potential conflict of interest. . . Moss' relationship with Kallman, the lack of open bidding process as well as the board's swift Jan[uary] 3 decision *sparked protests from some county residents . . .*"  (*Id*. at ¶51).

Plaintiff, in his capacity as County Administrator, had nothing to do with Corporation Counsel because he lacked authority to supervise, hire, fire, determine compensation, discipline, or evaluate the performance of Corporation Counsel.  (*Id*. at PageID.111-12, ¶¶53-61).  Additionally, Plaintiff was not responsible for the delegation of duties or assignments to Corporation Counsel; rather, attorneys within Corporation Counsel, Jack Jordan and Lanae Monera, would meet with David Kallman to determine whether to address any civil legal issues within Ottawa County.  (*Id*. at ¶54).  Mr. Jordan and Ms. Monera would then call the Board Chair and Vice Chair and offer legal advice.  (*Id*.)  Plaintiff was not invited to attend those calls with the Board Chair and Vice Chair.  (*Id*.)  In fact, Mr. Jordan verbally stated to Plaintiff, "We do not

report to you.  We report to the Board." (*Id*. at ¶¶55, 58).  Moreover, Plaintiff was not responsible for bookkeeping the invoices Ottawa County received from Corporation Counsel, and Plaintiff was not required to provide formal Reports to the Board on the assignments and legal findings of Corporation Counsel.  (*Id*. at ¶¶56-57).  Plaintiff had no authority to request Corporation Counsel to waive any of its legal fees billed to Ottawa County.  (*Id*. at ¶61).

### Plaintiff Asserts Protected Speech Regarding Corporation Counsel

On March 10, 2023, Plaintiff sent an email to Mr. Kallman, Mr. Jordan, Ms. Monera, Defendant Moss, and Vice Chair Sylvia Rhodea to address concerns about Corporation Counsel's timeliness, competency, and the quality of legal advice (the "March 10 Email").  (*Id*. at PageID.113-14, ¶¶62-69).  None of the concerns raised in Plaintiff's March 10 email were addressed by Corporation Counsel, Defendant Moss, or Ms. Rhodea.  (*Id*. at ¶70).

On July 18, 2023, Plaintiff sent a letter detailing the extensive deficiencies in Corporation Counsel's performance (the "Deficiency Letter") to the following recipients: Defendant Moss; Ms. Rhodea; Mr. Kallman; Commissioner Roger Belknap, Chair, Planning and Policy Committee; Commissioner Allison Miedema, Chair, Talent and Recruitment Committee; and Commissioner Gretchen Crosby, Chair, Finance and Administration Committee.  (*Id*. at ¶¶74-75).  Plaintiff stated in the Deficiency Letter: I do not have confidence in the ability of the Office of Corporation Counsel to fulfil its duties to the County."  (*Id*. at PageID.115-18, ¶76).  The Deficiency Letter further states, in pertinent part:

- **A County Commissioner was given totally incorrect advice by Counsel, causing an issue that should have been handled internally by the Board of Commissioners to be sent to outside Counsel, at cost to the County, and at the potential for litigation that could have been avoided if the issue had been handled internally**.  Importantly, Counsel did not consult with the Board Chair and Vice Chair – or any other member of the Board for that matter – nor with the County Administrator, prior to making this

7

erroneous decision.  **The continued risk that this method of operation poses to the County cannot be emphasized too strongly.**

- A sensitive Freedom of Information Act (FOIA) request implicating the privacy of dozens of candidates who applied for a position directly reporting to the County Administrator, was processed without consultation with the County Administrator, the Chair of the Board, or any member of the Board of Commissioners.  Decisions of such consequence must be shared with leadership beforehand, as such a decision could have **a chilling effect on applicants to County positions, who now face the potential to be targeted and attacked as the result of their information being released in an inappropriate manner**.

- **Significant delays in providing responses to routine requests for a legal opinion, often taking several weeks or months for standard requests, if any response is received at all**.  This applies not only to requests from the Office of the County Administrator, but also to requests from **numerous County stakeholders, who have informed me in confidence of their concerns, including weeks- or months-long delays and a lack of responsiveness to legal requests**.

  *         *         *

- **Counsel is unable or unwilling to write professional legal memos to deliver opinions and analyses**.  The use of legal memos to convey a response to a legal inquiry is the standard practice [in] public policy.  This is because a legal memo allows legal counsel to deliver analyses clearly and concisely, to reference the relevant statutes, case law, and comparable situations in the footnotes or inline comments, and to redline changes to proposed policy documents so that edits can clearly be seen and resolved.  Instead, Counsel only gives opinions orally, or in very short, informal written responses, with **no supporting statutory or case law references**.  This approach of providing only incomplete, informal responses makes it difficult to create policy.

- **Counsel lacks experience in municipal law and in the practice of providing legal counsel to government policymakers**.  **This results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information.  It also results in erroneous legal opinions**. . . .

- **Corporation Counsel often responds to a request for an opinion or analysis with "I don't know."  It is far outside of professional standards for Counsel to respond with "I don't know", when asked for a legal opinion or analysis by County leadership or County stakeholders**.  Rather, the industry standard practice is for a firm providing Counsel services to leverage the resources of their firm, and if necessary, the

8

extended networks connected to it, to do what it takes to get an answer in a timely manner.

(*Id*.)  The Deficiency Letter then states: "**I am now left with no other recourse but to ask you, the Board of Commissioners, to take action, to prevent any further risk to the County**."  (*Id*.)

Plaintiff's speech addressed shortcomings in Corporations Counsel's exercise of public functions.  (*Id*. at ¶77).  Plaintiff was uniquely equipped with information to explain the erroneous legal opinions of Corporation Counsel that impacted the public body; Plaintiff expressed concern over the privacy of citizens in Ottawa County "who now face the potential to be targeted and attacked as a result of their information being released in an inappropriate manner"; Plaintiff voiced concern on behalf of "County stakeholders" that informed Plaintiff "in confidence of their concerns"; Plaintiff explained that Corporation Counsel reports only to the Board; Plaintiff echoed concerns of the public that Corporation Counsel lacks legal experience in municipal law; and because Corporation Counsel was "unwilling to acknowledge any problems or improve their performance," Plaintiff was left "with no other recourse" but to ask the Board "to take action, to prevent any further risk to the County."  (*Id*. at PageID.119, ¶78).  Hence, the Deficiency Letter asserts protected speech about Corporation Counsel's incompetency to perform public governmental functions—for example, "the Office of Corporation Counsel in its current state is not able to effectively perform [its public functions] and is thus ill-positioned to serve [the Board] or the County."  (*Id*. at ¶79).  Plaintiff is not a licensed attorney in any jurisdiction within the United States and has no ordinary job duty to (a) assert speech on attorney ethics, (b) control Corporation Counsel's legal research or writing, and (c) report and recommend to the Board corrective actions for Corporation Counsel.  (*Id*. at PageID.122, ¶¶94-96).  Plaintiff did not, nor could he, gain any personal advantages by asserting his speech.  (*Id*. at PageID.120, ¶82).

It follows that Plaintiff's speech erodes public trust in the competency and fitness of Corporation Counsel.  (*Id*. at ¶83, 86).  Similarly, Plaintiff's speech erodes public trust in the Board for awarding Kallman Legal Group $580,320—**over half a million dollars**—to serve Ottawa County and its citizens with competent legal representation in civil matters.  (*Id*. at ¶¶84, 87-89).  The public's tax dollars pay, in part, for Ottawa County's legal fees to Corporation Counsel; therefore, the public's tax dollars pay for the "erroneous legal opinions" of Corporation Counsel.  (*Id*. at PageID.122, ¶97; PageID.123, ¶102).  Plaintiff learned that Corporation Counsel's legal memorandums often did not cite legal authority despite billing Ottawa County excessive hours for performing legal research.  (*Id*. at PageID.123, ¶103).  So, prior to sending the Deficiency Letter, Plaintiff went outside the chain of command and contacted members of the public, including attorneys, to inquire whether Corporation Counsel excessively billed Ottawa County.  (*Id*. at PageID.122-23, ¶¶99-101).  Further, Plaintiff's speech touched on the concern that Corporation Counsel billed Ottawa County unreasonably due to incompetence and lack of experience in municipal law by asserting that Corporation Counsel's repeated failures "results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information" and "results in erroneous legal opinions."  (*Id*. at PageID.121, ¶91).  Indeed, Plaintiff was trying to sound the alarm about attorney ethics and mismanagement of taxpayer dollars with public officials who he believed were in a position to address those concerns.  (*Id*. at PageID.122, ¶98).

MLive Media Group has since reported that invoices obtained via FOIA request "show Kallman Legal Group billed the county and its insurance authority for almost 3,006 hours of **work in 2023, resulting in a total charge of $731,755.31**" and "the county **board had to allocate $110,000 more for Kallman Legal Group's expenses in July 2023**," *i.e.*, the same month

Plaintiff sent the Deficiency Letter.  (*Id*. at PageID.123-25, ¶107).  Additionally, MLive reported, "[t]he law firm isn't known for, and doesn't list experience in, municipal law necessary for corporation counsel work on its website.  That was a concern raised by several county board members when Kallman Legal Group was hired, and the law firm has come under renewed scrutiny in recent weeks after fired county Administrator John Gibbs alleged the firm gave inaccurate legal opinions and took longer on routine legal work because it lacked legal experience, among other claims."  (*Id*.)  Commissioner Doug Zylstra commented to MLive: "Everybody can learn, but learning is not free, and education takes time and that's going to cost Ottawa County residents for our new lawyers to get up to speed" and "if you don't have the experience, you need to gain the experience and it's going to take some time to get that, and that's going to cost a little bit in billings."  (*Id*.)  Plaintiff's speech was a subject of legitimate news interest and of value and concern at the time he asserted it in the Deficiency Letter.  (*Id*. at PageID.123, ¶¶105-06).

### Defendants Retaliate Against Plaintiff

On July 21, 2023, Plaintiff was summoned to meet with Defendant Moss, Vice Chair Rhodea, Commissioner Belknap, Commissioner Miedema, Commissioner Cosby, David Kallman, Steven Kallman, and Jack Jordan to discuss the Deficiency Letter.  (*Id*. at PageID.125, ¶¶108-09).  But Plaintiff's concerns regarding Corporation Counsel's performance were not addressed and David Kallman used the time to insult Plaintiff.  (*Id*.)  Board members also told Plaintiff that he is "possessed by the devil."  (*Id*. at PageID.126, ¶110).  The Board never investigated Plaintiff's concerns.  (*Id*. at ¶111).

On November 6, 2023, the Board held a closed meeting to discuss Ottawa County Health Officer Adeline Hambley's severance payment because of a lawsuit filed by Ms. Hambley (the "*Hambley*" matter).  (*Id*. at PageID.126, ¶114).  At this meeting, the Board reached a "general

11

agreement" to pay Ms. Hambley $4.0M in exchange for Ms. Hambley's resignation and instructed Corporation Counsel "to write up a written agreement with those terms." (*Id*. at ¶115); (ECF No. 15-1, PageID.198). Plaintiff had no say to authorize the settlement but nevertheless outspokenly protested the decision as a gross misuse of taxpayer funds. (*Id*. at ¶116). The proposed $4.0M settlement was a topic of public concern—for example, on November 8, 2023, Fox 17 reported: "this could be the largest payout in Ottawa County's history" and "in the last 30 years, the county hasn't paid a combined $2M in litigation claims." (*Id*. at PageID.126-127, ¶117). Commissioner Jacob Bonnema commented to FOX 17: "… taxpayers now have to pay Mrs. Hambley as well as the salary of the full-time director who replaces her. **Double pay for half the work is the pattern of behavior for staffing decisions by Ottawa Impact commissioners**." (*Id*.)

On January 9, 2024, Plaintiff met with Defendant Moss and Vice Chair Rhodea and was asked to resign from his position, stating that his resignation would secure a settlement in a separate lawsuit initiated by an applicant for employment with the County (the "*Kimball*" matter). (*Id*. at PageID.126, ¶112; PageID.128, ¶118). Plaintiff's resignation has never been a negotiable settlement term in the *Kimball* matter, and Plaintiff refused to resign. (*Id*. at PageID.128, ¶¶119-20). At no time did Defendant Boss or Vice Chair Rhodea criticize Plaintiff's performance during the January 9, 2024 meeting. (*Id*. at ¶121). Later, on January 12, 2024, Defendant Moss telephoned Plaintiff and again requested that he resign but did not criticize Plaintiff's job performance during the call. (*Id*. at ¶122). Plaintiff perceived that Defendants' request for his resignation were retaliatory violations of law; therefore, Plaintiff reported suspected violations of law to his attorneys. (*Id*. at ¶¶123-124). Defendant Moss is a business partner with family members of Corporation Counsel and Vice Chair Rhodea has personal connections with the firm. (*Id*. at PageID.108-111, ¶¶49-52; PageID.128, ¶125). Defendants' personal interests to retain

Kallman Legal Group as corporation counsel motivated the retaliatory efforts against Plaintiff for criticizing the firm.  (*Id*. at ¶126).

On January 15, 2024, Plaintiff attended an Insurance Authority meeting with Defendant Moss, Vice Chair Rhodea, and Commissioner Cosby, wherein Plaintiff protested the Board decision to pay Ms. Hambley $4M for her resignation.  (*Id*. at ¶128).  That same day, Plaintiff's prelitigation counsel sent the Board a letter explaining that the Board had no cause to terminate Plaintiff or request his resignation, and the letter further stated: "be advised that the full extent of legal options available to Mr. Gibbs will be used to ensure the Board ceases to violate Mr. Gibbs' constitutional, statutory, and contractual rights any further than it already has to date" and "[t]o be clear, there is no scenario where the Board's adverse conduct against Mr. Gibbs is not put under a microscope by a court of competent jurisdiction if it does not regain its senses and begin treating Mr. Gibbs with dignity."  (*Id*. at PageID.129, ¶¶129-30).  A month later, on February 15, 2024, Plaintiff's litigation counsel sent a letter to the Board detailing Defendants' violations of law, including Plaintiff's First Amendment rights, 42 U.S.C. § 1983, and Michigan's Whistleblower Protection Act.  (*Id*. at ¶131).

On February 21, 2024, Plaintiff received a written "Notice" from the Ottawa County Clerk/Register of Deeds stating that the Board scheduled a special meeting on February 22 to "***consider a response to the letter from the County Administrator John Gibs***" – hence, the February 22, 2024 meeting was precipitated by Plaintiff's July 18, 2023 Deficiency Letter, as well as both the January 15 and February 15, 2024 letters from his attorneys warning Defendants against violations of law.  (*Id*. at ¶¶132-33).  During the meeting on February 22, 2024, the Board verbally informed Plaintiff of "complaints" concerning his performing by reading off a sheet of paper that was not offered to Plaintiff.  (*Id*. at ¶134).  None of the "complaints" had been raised with Plaintiff

prior to the meeting or previously reported to Ottawa County's Human Resources Department. (*Id*. at ¶¶134-35).  The Board then placed Plaintiff on administrative leave for sending the July 18, 2023 Deficiency Letter and for the two letters sent by Plaintiff's pre-litigation and litigation counsel outlining Plaintiff's belief that Defendants were violating the law.  (*Id*. at PageID.130, ¶¶136-37).

### Defendant Moss Defames Plaintiff on Facebook

On February 23, 2024, Defendant Moss sent Plaintiff a letter detailing the alleged complaints regarding his performance (the "Complaint Letter").  (*Id*. at ¶¶138-39).  The Complaint Letter contains a series of defamatory statements attributed to an anonymous "county employee" and an anonymous "Ottawa County Board Commissioner."  (*Id*. at PageID.130-33, ¶¶139-42). The defamatory statements are false and have no basis in fact.  (*Id*. at ¶144).  Defendant Moss published the Complaint Letter to his public Facebook page and attached a freely accessible copy. (*Id*. at ¶¶145-46).  As a result of Defendant Moss's Facebook post, the Complaint Letter and the defamatory statements therein were widely publicized and featured in several newspapers.  (*Id*. at PageID.134, ¶¶146-48).  Moreover, the defamatory statements regarding Plaintiff were never published by Defendants until after Plaintiff asserted his speech regarding Corporation Counsel and his attorneys sent letters to Defendants warning against violations of law.  (*Id*. at PageID.135, ¶¶149-51).  On February 27, 2024, Plaintiff responded to the Complaint Letter by addressing each of the defamatory statements line-by-line to demonstrate that Defendant Moss falsified the information, but Defendant Moss did not share Plaintiff's response to the Board.  (*Id*. at ¶¶153-54).  Nevertheless, on February 29, 2024, the Board terminated Plaintiff for cause, citing the defamatory statements recited in the Complaint Letter.  (*Id*. at ¶¶155-56).

### <u>STANDARD OF REVIEW</u>

Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead sufficient factual matter to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). A complaint survives a Fed. R. Civ. P. 12(b)(6) challenge if it "state[s] a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise relief above the speculative level." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable references in favor of the plaintiff." *Handy-Clay*, 695 F.3d at 538.

## **ARGUMENT**

## I. **PLAINTIFF'S AMENDED COMPLAINT SUFFICIENTLY PLEADS A *PRIMA FACIE* CASE OF FIRST AMENDMENT RETALIATION.**

The First Amendment prohibits state actors from "abridging the freedom of speech" (U.S. Const. Amend. I) and "protects the right of an ordinary citizen to criticize public officials . . . without fear of criminal or civil repercussions." *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 513 (6th Cir. 2020). Plaintiff must plausibly allege that: (1) he engaged in constitutionally protected conduct; (2) Defendants took adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Haddad v. Gregg*, 910 F.3d 237, 243 (6th Cir. 2018). Defendants do not contest that Plaintiff's speech within the July 18, 2023 Deficiency Letter caused his termination, so the only issue is whether Plaintiff's speech is protected.

15

There is a three-step inquiry to determine whether speech by a public employee is protected. First, Plaintiff's speech must address a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Second, Plaintiff must speak as a private citizen and not as an employee pursuant to his ordinary official duties. *Lane v. Franks*, 573 U.S. 228 (2014). Finally, courts engage in the balancing test articulated in *Pickering v. Bd. of Educ.* to determine if the employee's speech outweighs "the interest of the State, as an employer, in promoting the efficiency of the public serves it performs through its employees." 391 U.S. 563, 568 (1968). Here, Defendants concede that Plaintiff's speech addressed a matter of public concern and neglect to engage in the *Pickering* balancing test. This matter therefore turns on whether Plaintiff spoke as a private citizen or as a public employee.

### A.    Plaintiff Engaged in Constitutionally Protected Conduct by Speaking as a Private Citizen.

*Garcetti* held that speech "pursuant to the employee's official duties" (*i.e.*, "employee-speech") is unprotected. 547 U.S. at 421. The Supreme Court later clarified in *Lane* that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S at 240. The Supreme Court cautioned there is "considerable value" in "encouraging, rather than inhibiting, speech by public employees. For, [they] are often in the best position to know what ails the agencies for which they work." *Id*. at 236. Hence, Defendants must show that the speech at issue is related to Plaintiff's ***ordinary*** job responsibilities for it to fall outside First Amendment. *See Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) ("After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment."). The Supreme Court's inclusion of the word "ordinary" was to "avoid transforming broad swaths of speech by employees

16

into unprotected employee-speech simply because it concerned the speaker's public employment." *Colorez v. City of Cincinnati*, 441 F. Supp. 3d 560, 568 (S.D. Ohio 2020).

Even if Plaintiff's speech relates to his employment, it does not mean it is employee-speech. Defendant argues, "Plaintiff would not have been in a position to interact with corporation counsel and form a subjective judgment about the performance of corporation had he not occupied the position of County Administrator." ECF No. 15, PageID.181. However, "[t]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into an unprotected utterance." *Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 487 (M.D. Tenn. 2019) (quoting *Lane*, 573 U.S. at 240). Defendants fail to acknowledge the point in *Lane* that "speech made by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." 573 U.S. at 240; *see also Garvin v. Detroit Bd. of Educ.*, 2013 WL 951118 at *11 (Mich. Ct. App. Feb. 26, 2013) ("When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation"). Likewise, the fact that Plaintiff "expressed his views inside his office, rather than publicly, is not dispositive." *Garcetti*, 547 U.S. at 420. Therefore, Plaintiff's First Amendment retaliation claim is not foreclosed merely because he learned of Corporation Counsel's inexperience in municipal law, inadequate legal memorandums, and excessive billing as a result of his employment.

"Determining whether an employee speaks as a private citizen or as a public employee can be challenging" since there is no "comprehensive framework for defining the scope of an employee's duties," so "the inquiry is a practical one." *Mayhew v. Town of Smyrna, Tennessee*,

17

856 F.3d 456, 464 (6th Cir. 2017) (citing *Garcetti*, 547 U.S. at 424).  This Court should consider

non-exhaustive factors including: the speech's impetus; its setting; its audience; and its general

subject matter. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540-41 (6th Cir. 2007).  Allegations

Plaintiff provided in his Amended Complaint to support the private citizens prong include:

> **Paragraph 36**: Plaintiff's responsibilities and job duties described in Exhibit A of the Employment Agreement are facially void of any reference to hiring or firing Corporation Counsel.  Instead, pursuant to MCL § 49.7, only the Board shall "employ" Corporation Counsel.
>
> **Paragraph 37**: Plaintiff's responsibilities and job duties described in Exhibit A of the Employment Agreement are facially void of any reference to determining or recommending the compensation provided to Corporation Counsel.
>
> **Paragraph 44**: The January 3, 2023 Resolution does not instruct that Corporation Counsel is supervised or directed by Plaintiff as the County Administrator.
>
> **Paragraph 46**: Plaintiff was not asked by the Board to recommend compensation and benefits for the employment of Corporation Counsel.
>
> **Paragraph 47**: Plaintiff was not involved in the negotiation or presentation of Corporation Counsel's contract with Ottawa County.
>
> **Paragraph 53**: The reality of Plaintiff's employment responsibilities and duties as County Administrator is that he lacked authority to supervise, hire, fire, determine compensation, discipline, or evaluation the performance of Corporation Counsel.
>
> **Paragraph 54**: Plaintiff was not responsible for the delegation of duties or assignments to Corporation Counsel.  Instead, attorneys within Kallman Legal Group, PLLC, Jack Jordan and Lanae Monera, would meet with David Kallman to determine whether to address any civil legal issues within Ottawa County.  Then, Mr. Jordan and Ms. Monera would call the Board Chair and Vice Char to offer legal advice.  Plaintiff was not invited to attend those calls with the Board Chair and Vice Chair.
>
> **Paragraph 55**: Mr. Jordan verbally stated to Plaintiff: "We do not report to you. We report to the Board."
>
> **Paragraph 56**: Plaintiff was not required to keep records or perform bookkeeping of the invoices sent by Corporation Counsel.

**Paragraph 57**: Plaintiff was not responsible for or required to provide formal reports to the Board on the assignments, legal opinions, and/or findings of Corporation Counsel.

**Paragraph 58**: Plaintiff's ordinary job responsibilities and duties required him to meet with other department directors within Ottawa County at least once a month. However, Plaintiff never held monthly meetings with Corporation Counsel because the attorneys of Kallman Legal Group told Plaintiff that they "report to the Board."

**Paragraph 59**: If Plaintiff requested a meeting with Corporation Counsel, Plaintiff's request was ignored.

**Paragraph 60**: Plaintiff was not responsible for or required to provide formal performance evaluations of Corporation Counsel.

**Paragraph 61**: Plaintiff was not responsible for instructing or requesting Corporation Counsel to waive any of its legal fees billed to Ottawa County.

**Paragraph 76**: **Significant delays in providing responses to routine requests for a legal opinion, often taking several weeks or months for standard requests, if any response is received at all**. This applies not only to requests from the Office of the County Administrator, but also to requests from **numerous County stakeholders, who have informed me in confidence of their concerns, including weeks- or months-long delays and a lack of responsiveness to legal requests**.

**Paragraph 76**: Counsel is unable or unwilling to write professional legal memos to deliver opinions and analyses. The use of legal memos to convey a response to a legal inquiry is the standard practice [in] public policy. This is because a legal memo allows legal counsel to deliver analyses clearly and concisely, to reference the relevant statutes, case law, and comparable situations in the footnotes or inline comments, and to redline changes to proposed policy documents so that edits can clearly be seen and resolved. **Instead, Counsel only gives opinions orally, or in very short, informal written responses, with no supporting statutory or case law references**. This approach of providing only incomplete, informal responses makes it difficult to create policy.

**Paragraph 76**: Counsel lacks experience in municipal law and in the practice of providing legal counsel to government policymakers. **This results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information. It also results in erroneous legal opinions**.

**Paragraph 76**: Corporation Counsel often responds to a request for an opinion or analysis with "I don't know." **It is far outside of professional standards for Counsel to respond with "I don't know", when asked for a legal opinion or analysis by County leadership or County stakeholders**.

19

**Paragraph 94**: Plaintiff is not a licensed attorney in any jurisdiction within the United States and has no employment duty to assert speech on attorney ethics.

**Paragraph 95**: Plaintiff is not a licensed attorney in any jurisdiction within the United States and has no supervisory capacity to control Corporation Counsel's legal opinions or legal writings.

**Paragraph 96**: Plaintiff's ordinary job responsibilities do not include reporting and recommending corrective actions for licensed attorneys, including Corporation Counsel.

**Paragraph 98**: Plaintiff was trying to raise the alarm about attorney ethics and mismanagement of taxpayer dollars with public officials who he believed were in a position to address those concerns.

**Paragraph 99**: Prior to sending the Deficiency Letter, Plaintiff contacted members of the public, including attorneys, to raise concern and inquire whether Corporation Counsel excessively billed Ottawa County.

**Paragraph 100**: Plaintiff also contacted Ottawa County Public Defender Nichole Jongsma-Derks to raise concern over the lack of responsiveness and excessive billing practices of Corporation Counsel.

**Paragraph 103**: Plaintiff learned that the legal memorandums of Corporation Counsel often did not cite legal authority despite billing Ottawa County excessive hours performing legal research.

**Paragraph 106**: Plaintiff's speech was asserted as a concerned citizen addressing the Board knowingly hiring an incompetent Corporation Counselbecause of a perceived conflict-of-interest and mismanagement of public funds.

Accordingly, the Amended Complaint makes clear that the issues Plaintiff raised fall more in the purview of a Board Commissioner with voting capacity to employ Corporation Counsel, rather than a County Administrator.  It is the ordinary job duty of the Ottawa County Board of Commissioners to delegate assignments to Corporation Counsel, meet with Corporation Counsel in closed meetings to discuss legal strategy, evaluate Corporation Counsel's performance and competency, investigate and report inefficiencies of Corporation Counsel, review Corporation Counsel's invoices, and assess Corporation Counsel's ethics.  However, ***Plaintiff is not paid to perform any of those functions***.  ECF No. 12, ¶¶36-37, 44, 46-47, 53-54, 56-61, 76.

20

In fact, Plaintiff's ordinary job duties were far removed from Plaintiff's speech regarding the timeliness, efficiency, experience, competency and cost of Corporation Counsel.  As County Administrator, Plaintiff procured budgeting software for the County, created a County Strategic Plan based on metrics, restructured the Capital Improvement Planning process and restructured the Facilities Department to handle the County's physical assets, managed the County's accounts payable report, facilitated the approval of grants, created a Communications Department, and staffed the Department of Veterans affairs. *Id.* at ¶19.  Plaintiff's ordinary job duties did not require him to monitor Corporation Counsel and uncover errors in their performance—that is precisely why Mr. Jordan told Plaintiff, "[w]e do not report to you[,] we report to the Board." *Id.* at ¶¶55-58.

Plaintiff's position as County Administrator inherently lacks authority to investigate or discipline Corporation Counsel, officers to the Board. *Id.* ¶35.  Notably, the Board never asked for Plaintiff's opinion on Corporation Counsel or required him to draft the Deficiency Letter as part of his administrative duties.  Defendants flat-out ignored Plaintiff's concerns, which is indicative that it was not an ordinary job duty for Plaintiff to criticize Corporation Counsel. Further, Plaintiff's job description is facially void of the obligation to "investigate", "correct", "report", "evaluate" or "discipline" Corporation Counsel.  ECF No. 12-1, PageID.153.  Plaintiff's job description does not indicate that he has an ordinary job duty to advise the Board on matters related to selecting and/or replacing Corporation Counsel. *Id.*  As such, Plaintiff's job description, on its face, is not definitive enough to warrant a ruling against him.  Accepting Plaintiff's allegations as true, the realities of his employment as County Administrator did not involve the ordinary duty to assert the Deficiency Letter regarding Corporation Counsel.

The protected speech at issue was regarding Corporation Counsel's malfeasance and/or misfeasance (*i.e.*, unreasonably billing Ottawa County due to incompetence and inexperience in municipal law) when the Board initially awarded the firm a $580,320 contract to represent Ottawa County in civil matters and was later forced to allocate an additional $110,000 for Corporation Counsel's expenses in July 2023—the same month Plaintiff circulated the Deficiency Letter.  ECF No. 12, ¶¶83-103, 105-07.  The subject matter of Plaintiff's speech was the question of Corporation Counsel's fitness to execute its duties for the public, not just the Board.  *Id.* ¶76.  Nevertheless, Defendant claims Plaintiff's speech "related to how corporation counsel's performance impacted Plaintiff's ability to do his own job[.]" ECF No. 15, PageID.177.  If there was a systematic practice within Ottawa County to pay exorbitant fees for Corporation Counsel's *inadequate* legal advice to the Board, department directors and members of the public, this would inevitably affect Plaintiff's ability to perform his job of providing *adequate* day-to-day administration of Ottawa County.  To foreclose Plaintiff's claim on this relationship stretches the logic of *Garcetti* and *Lane* to an unreasonable degree—encompassing all speech that aims to improve a government employee's workplace—and ignores the Supreme Court's repeated reminders that government employees' speech is most valuable when it concerns a subject they know best: their jobs.  *See*, *e.g.*, *Garcetti*, 547 U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job"); *Lane*, 134 S. Ct. at 239 ("*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment.  The *Garcetti* Court made explicit that its holding did not turn on the fact that the memo at issue 'concerned the subject of [the prosecutors] employment' because [t]he First Amendment protects some expressions related to the speaker's job.'"); *Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds

allotted to the operations of the schools should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal"); *San Diego v. Roe*, 543 U.S. 77, 80 (2004) (observing that public employees "are uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large").  Plaintiff was uniquely equipped with information on the public's concern regarding Corporation Counsel—his First Amendment rights should not be restricted just because reporting malfeasance and/or misfeasance would benefit the execution of his job by removing impediments to proper government functioning.  *See* ECF No. 12, ¶¶125-26 ("Defendants are motivated by personal interests to retain Kallman Legal Group, PLLC as the County's Corporation Counsel and retaliated against Plaintiff for criticizing the firm").

The Deficiency Letter's audience was Defendant Moss, Vice Chair Rhodea, Mr. Kallman, Commissioner Belknap, Commissioner Miedema, and Commissioner Crosby.  ECF No. 12, ¶75. However, Defendants fail to acknowledge that Plaintiff's speech also went outside the chain of command by discussing his concerns with to members of the public (including non-government attorneys), Ottawa County Public Defender Nichole Jongsma-Derks, and Deputy County Administrator Benjamin Wetmore.  *Id*. at ¶¶99-101 ("Prior to sending the July 18 Deficiency Letter, Plaintiff contacted members of the public, including attorneys, to raise concern and inquire whether Corporation Counsel excessively billed Ottawa County").  Additionally, Plaintiff was clearly not only expressing the content of his letter to the Board because it indicates that he was having conversations with members of the public about Corporation Counsel's inadequate performance.  *Id*. at ¶76 ("numerous County stakeholders, who have informed me in confidence of their concerns, including weeks or months-long delays and a lack of responsiveness to legal requests").  Hence, Plaintiff asserted his speech when others failed to act on behalf of the public

despite their awareness of Corporation Counsel's deficiencies.   Speech outside the chain of command is less likely to be within an employee's ordinary job duties.  *See Handy-Clay*, 695 F.3d at 542-43 (holding that the employee spoke as a citizen because her speech concerned improper use of funds; the speech was directed to an audience both inside and outside her department; the speech directed to individuals outside her department was clearly not part of her official duties; the employee was not asked to investigate or give her opinion on the alleged misconduct; and her comments were extraordinary rather than every day communications).

Defendants mischaracterize *Mayhew* by arguing that the case rejected the *Pucci v. Nineteenth District Court*, 628 F.3d 752, 768 (6th Cir. 2010) holding that "extraordinary" speech cannot encompass "ordinary job responsibilities."   ECF No. 15, PageID.184.   In fact, *Mayhew* does not cite *Pucci* or discuss the idea of "extraordinary" speech, and other post-*Mayhew* cases hold that "extraordinary speech" cannot constitute employee-speech.  *See*, *e.g.*, *Romero v. City of Middletown*, 479 F. Supp. 3d 660, 679 (S.D. Ohio 2020) (Romero, an Assistant Lab Analyst, was not tasked with investigating conditions around a water treatment plant, nor monitoring compliance with regulatory obligations; the comments where not prompted by his supervisor's request to inspect plant operations; and while Romero did voice concerns to his supervisors, he also spoke with people outside the water treatment plant); *Ladach v. City of Romulus*, 2018 WL 5077181 at *8 (E.D. Mich. Aug. 24, 2018).   In *Pucci*, the public employee's comments were "extraordinary rather than everyday communication" when a court administrator asserted speech to an audience both inside and outside her chain of command, alleging that her supervisor, Judge Mark Somers, was violating the constitutional rights of litigants.  628 F.3d at 768.  The sixth Circuit observed, "the nature of Pucci's complaints implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First

Amendment protection." *Id*.  Here, Plaintiff's speech is extraordinary because it necessarily implicates the propriety of Corporation Counsel (*See* ECF No. 12, ¶90, "It is far outside of professional standards for counsel to respond with 'I don't know', when asked for a legal opinion or analysis by County leadership or County stakeholders") and erodes public trust in the Board, elected officials, for misusing taxpayer dollars to pay Ottawa County's unprecedentedly high legal fees to Corporation Counsel (*See Id*. at ¶¶102-07).  Further, Plaintiff asserts that Corporation Counsel's failure to provide competent representation "results in standard requests for analysis taking much longer than expected, since Counsel must start from scratch when gathering information.  It also results in erroneous legal opinions."  *Id*. at ¶91.  This statement implicates Corporation Counsel's trustworthiness—"[a] lawyer shall act with reasonable diligence and promptness in representing a client" and "[e]ven when the client's interests are not affected in substance, however, unreasonable delay *can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness*."  Mich. R. Prof'l. Cond. 1.3.

Lastly, Defendants' attempt to analogize this matter to *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.,* 605 F.3d 345 (6th Cir. 2010) and *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456 (6th Cir. 2017) is unavailing because both cases were decided at the same judgment stage—and it is obviously premature to construe any inferences against Plaintiff at this juncture.  *See O'Neal v. 52nd Dist. Ct.*, No. 22-10470, 2022 WL 19976193, at *5 (E.D. Mich. Nov. 4, 2022) ("the primary cases Defendants use to argue that [the plaintiff] acted as a public employee were decided on summary judgment, which employs the incorrect standard for 12(b)(6) purposes").  Accordingly, Plaintiff pleads adequate facts to set forth a plausible claim of First Amendment Retaliation because the content of his speech fell outside the scope of his ordinary duties and was asserted as a private citizen, not a public employee.

25

## II.     PLAINTIFF'S AMENDED COMPLAINT SUFFICIENTLY PLEADS A *PRIMA FACIE* CASE OF MICHIGAN'S WHISTLEBLOWER PROTECTION ACT.

Section 2 of the Michigan Whistleblower Protection Act ("WPA") provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employees' compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.  MCL 15.362.

The Michigan Supreme Court explains that the WPA "protect[s] those employees who engage in whistleblowing activities.  It does so with an eye toward promoting public health and safety.  The underlying purpose of the act is protection of the public.  The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law."  *Dolan v. Cont'l Airlines/Cont'l Exp.*, 454 Mich. 378 (1997).  As such, "[t]he WPA, as a remedial statue, is to be liberally construed to favor the person the legislature intended to benefit."  *Chandler v. Dowell Schlumberger Inc.,* 456 Mich 395, 406 (1998).  To survive Defendants' Fed. R. Civ. P. 12(b)(6) challenge to Plaintiff's WPA claim, the Amended Complaint must plausibly allege: (1) he engaged in protected activity as defined by the act; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *Pace v. Edel-Harrelson*, 499 Mich. 1, 6 (2016).  Defendant only argues against the first element.  ECF No. 15, PageID.188.

"Protected activity" under the WPA consists of (1) reporting to a public body a violation or suspected violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.  *Chandler*, 456 Mich. at 399.  Here, Plaintiff reported to a public body—his prelitigation counsel (Aaron Davis of

26

Butzel Long, P.C.) and litigation counsel (Noah Hurwitz of Hurwitz Law PLLC)—suspected violations of law based on unlawful employment retaliation.  *See* ECF No. 12, ¶¶123-24 ("Plaintiff perceived and suspected Defendants' requests for him to resign as violations of law" and "Plaintiff suspected that Defendants' requests for Plaintiff to resign were retaliatory and violated the law; therefore, Plaintiff reported suspected violations of law to his attorneys"); *Id*. at ¶¶129-30 (On January 15, 2024, Plaintiff prelitigation counsel sent the Board a letter explaining that it had no cause to terminate Plaintiff or to request his resignation and stated, "***be advised that the full extent of legal options available to Mr. Gibbs will be used to ensure the Board ceases to violate Mr. Gibbs' constitutional, statutory, and contractual rights any further than it already has to date***"); *Id*. ¶131 (On February 15, 2024, ***Plaintiff's litigation counsel sent a letter to the Board explaining in detail Defendants' violations of law, including Plaintiff's First Amendment Rights, 42 U.S.C. § 1983, and the WPA***).  Critically, "[t]here is absolutely nothing, express or implied, in the plain wording of the statute that limits its applicability to ***violations of law by the employer*** or to investigations involving the employer."  *Kimmelman v. Heather Dawns Mgt. Ltd*., 278 Mich.App. 569, 575 (2008) (emphasis added).

Instead, it is well established that a practicing Michigan attorney qualifies as a member of a "public body" for WPA purposes.  *McNeill-Marks v. Midmichigan Med. Ctr.-Gratiot,* 316 Mich. App. 1, 21 (2016).  The phrase "public body" is statutorily defined by the WPA and includes: "***Any other body which is created by state or local authority or which is primarily funded by or though state or local authority, or any member or employee of that body***."  MCL 15.361(d)(iv).  It is undisputed that Davis and Hurwitz were licensed attorneys and members in good standing of the State Bar of Michigan ("SBM") when Plaintiff reported that he suspected Defendants were committing unlawful retaliatory conduct. As practicing attorneys, licensure and active membership

in the SBM are both mandatory.  *See* MCL 600.916(1); *see also Morris & Doherty, P.C. v. Lockwood*, 259 Mich.App. 38, 49 (2003) ("A person engaged in the practice of law in Michigan must be an active member of the State Bar").  Further, under MCL 600.901,

> *[t]he state bar of Michigan is a public body corporate*, the membership of which consists of all persons who are now and hereafter licensed to practice law in this state.  *The members of the state bar of Michigan are officers of the courts of this state*, and have the exclusive right to designate themselves as "attorneys and counselors," or "attorneys at law," or "lawyers."    No person is authorized to practice law in this state unless he complies with the requirements of the supreme court with regard thereto.

Thus, Davis and Hurwitz are members of a "public body" for WPA purposes as practicing attorneys and members of the SBM.  Both Davis and Hurwitz are members of a body "created by" state authority, which, through the regulation of the Michigan Supreme Court, is also "primarily funded by or through" state authority.  Moreover, there is no evidence, and Defendants do not argue, that Plaintiff did not actually believe Defendants' retaliatory actions of repeatedly asking him to resign violated the law.  Hence, by reporting Defendants' conduct to his attorneys to remedy Ottawa County's retaliatory requests for Plaintiff's resignation, he was engaged in protected activity under the WPA

Further, on February 21, 2024, Plaintiff received a written "Notice" from the Ottawa County Clerk/register of Deeds stating that the Board scheduled a special meeting for February 22, 2024 to "consider a response to the letter from the County Administrator John Gibbs."  ECF No. 12, ¶132.  Hence, the February 22 meeting was precipitated by: (a) Plaintiff's Deficiency Letter concerning Corporation Counsel; and (b) both the January 15 and February 15, 2024 letters from his attorneys warning against Defendants retaliatory violations of law.  *Id*. ¶133.  Defendants do not dispute that Plaintiff was swiftly placed on administrative leave and then terminated because

28

of his protected activity of reporting suspected violations of law to his attorneys.  Accordingly, Plaintiff's Amended Complaint plausibly alleges that Defendants violated the WPA.

### III.    DEFENDANT MOSS ACTED OUTSIDE THE SCOPE OF HIS LEGISLATIVE AUTHORITY BY POSTING TO HIS FACEBOOK PAGE DEFAMATORY CONTENT REGARDING PLAINTIFF AND RECEIVES NO IMMUNITY.

Defendant Moss does not challenge whether Plaintiff's Amended Complaint plausibly alleges facts to set forth a *prima facie* case of defamation under Michigan law.  Instead, Defendant Moss claims he is protected by absolute governmental immunity under MCL 691.1407(5), which provides:

> A judge, legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.  *See* ECF No. 15, PageID.191.

Critically, individual members of local governmental bodies, like Defendant Moss, are absolutely immune when conducting "legitimate legislative activity."  *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 54 (1998).  However, "[n]ot all governmental acts by local government bodies are necessarily legislative in nature, and the various activities of most local or municipal offices cannot be characterized as only administrative, legislative, or judicial."  *Anders v. Cuevas*, 984 F.3d 1166, 1181 (6th Cir. 2021).  Indeed, it is only with respect to the legislative powers delegated to them that an official like Defendant Moss is entitled to absolute immunity.  *Id*.  "The existence of that immunity turns on the nature of the act, not the motive or intent of the official performing it."  *Id*. (quoting *Bogan*, 523 U.S. at 54).  The Sixth Circuit in *Anders* adopted a two-part test based on the Supreme Court's guidance in *Bogan* to determine whether particular acts are legislative in nature: first, this Court must consider whether the alleged acts were legislative in form, *i.e.*, whether "they were integral steps in the legislative process"; and, second, this Court must analyze the substance of Defendant Moss's acts to determine whether they bear "all the hallmarks of traditional

legislation," including "a discretionary, policy making decision[.]"  *Id*. at 1811-82.  If Defendant Moss does not meet his burden to establish both requirements, then he is not immune.

In *Bogan*, the Supreme Court held that a decision by local legislators to *eliminate* an employment position from local government was a legislative act.  *Bogan*, 523 U.S. at 55-56.  However, the Court contrasted that situation with "the hiring or firing of a particular employee," which the Court indicated was not a legislative act.  *Id*.  The distinction is that eliminating a position, "unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office."  *Id*.  Here, the Count Administrator position was not eliminated within Ottawa County to cut costs.  The Board's decision to either employ or terminate Plaintiff did not necessarily have prospective budgetary implications beyond Plaintiff himself and was not legislative in nature because the action had no implication for the position of County Administrator in general—it was focused on the discipline of Plaintiff.  Hence, the Complaint Letter containing defamatory statements about Plaintiff does not bear the hallmarks of traditional legislation; that is, it did not reflect a discretionary, policymaking decision implicating Ottawa County's budgetary priorities and its services to its constituents.

Defendant Moss does not contend that he shared the Complaint Letter with constituents because it implicated the budgetary priorities of Ottawa County or was integral to the legislative process.  On the contrary, the specific purpose of posting the Complaint Letter to Defendant Moss's Facebook page was to discuss the employment of a public employee.  *See Canary v. Osborn*, 211 F.3d 324, 330 (6th Cir. 2000) (a school board's decision not to renew the plaintiff's contract as assistant principal was not legislative in substance because the school board "was making personalized assessments of individual employees, not engaging in an impersonal budgetary analysis of various positions" and the decision did not have prospective implications

beyond the effect on the plaintiff).  Put simply, the Board's decision to employ Plaintiff as County Administrator is an *administrative* decision—not a legislative one.  *See Id*. (quoting *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988)) ("Employment decisions generally are administrative…").  Thus, Defendant Moss posting the Complaint Letter to his Facebook page is not a legitimate legislative activity in substance or within the scope of his legislative authority.

The cases Defendant Moss cites are inapposite.  *American Transmissions, Inc. v. Attorney General*, 454 Mich. 135 (1997) and *Brown v. Mayor of Detroit*, 271 Mich. App. 692 (2006) do not incorporate *Bogan* and dealt with *executive authority*, not legislative.  The sole case Defendant Moss offers for the proposition that he acted within the scope of his legislative authority by posting the defamatory Complaint Letter to his Facebook page is the unpublished *Chupa v. Moceri*, No. 288338, 2010 WL 746243 (Mich. Ct. App. Mar. 4, 2010), which likewise does not discuss *Bogan* and was rejected by the Sixth Circuit in *Anders*.  Defendant Moss argues that *Chupa* should apply because the Facebook post "informed his constituents of the reason for the discussion that would take place at the Board of Commissioners' meeting regarding Plaintiff's employment."  ECF No. 15, PageID.194.  However, at the time Defendant Moss published the Complaint Letter to Facebook, the Board had not yet discussed Plaintiff's employment contract at an open meeting. While Defendant Moss's statements "may have been made against the *backdrop*" of the Board's consideration of Plaintiff's employment contract, it is not clear from the Facebook post that Defendant Moss published the Complaint Letter to address the status of Plaintiff's employment contract.  *See Anders*, 948 F.3d at 1188 (reversing dismissal of the plaintiff's defamation claim on absolute immunity grounds because the defendant "offers no support to suggest that governmental immunity is a license to make defamatory statements about matters not before the city council simply because the individuals or entities defamed are the *subject* of official city council

business"). Regardless, the Facebook post was not integral to the legislative process or furthered a discretionary, policymaking decision. Accordingly, Defendant Moss is not entitled to absolute governmental immunity.

## **CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests this Court deny Defendant's Fed. R. Civ. 12(b)(6) Motion to Dismiss in its entirety.

Respectfully submitted,

HURWITZ LAW PLLC

/s/ Noah S. Hurwitz
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, Michigan 48104
(844) 487-9489
noah@hurwitzlaw.com

Dated: August 5, 2024        grant@hurwitzlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to the attorney(s) of record.

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
